STATE of Minnesota, Respondent,

v.

Daniel Leonard ANDERSON,
Appellant.

No. A07–1622.

Supreme Court of Minnesota.

March 26, 2009.

Lawrence Hammerling, Chief State Appellate Public Defender, Suzanne M. Senecal–Hill, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN; and Timothy E.J. Fox, Wilkin County Attorney, Breckenridge, MN, for respondent.

OPINION

GILDEA, Justice.

On May 25, 2007, a Wilkin County jury found appellant Daniel Leonard Anderson (Anderson) guilty of first-degree murder while committing domestic abuse, Minn. Stat. § 609.185(a)(6) (2008), and second-degree felony murder, Minn.Stat. § 609.19, subd. 2(1) (2008), for the death of A.G., the one-year-old son of his girlfriend. The district court convicted Anderson on the first-degree murder while committing domestic abuse charge and sentenced Anderson to life imprisonment. Anderson filed a direct appeal to this court arguing that the district court erred in admitting the testimony of three witnesses who described Anderson's prior behavior. Anderson also submitted a pro se supplemental brief, raising issues of ineffective assistance of counsel and police misconduct. We affirm.

The evidence at trial established that Anderson and A.G.'s mother, Monica, met in the summer of 2005 and began dating by the end of that year. Anderson lived at home with his parents and his sister, B.A. Monica and A.G., her son from a previous relationship, moved in with the Andersons in early 2006. On May 31, 2006, D.G., the son of Monica and Anderson, was born. Anderson, Monica, and D.G. shared a bedroom, and A.G. had his own bedroom.

On October 4, 2006, Anderson, Monica, and B.A. went out to dinner around 6 p.m. Anderson's parents stayed home with the children. Anderson drove B.A.'s green Cadillac because his own car was broken. The three had dinner and some drinks before returning to the Andersons' house. On their way home, they stopped to buy a twelve-pack and a six-pack of beer. After checking on the children at the Andersons' home, they went to a trailer that Anderson and Monica were planning to purchase. They stayed at the trailer and drank the beer. When they finished, the three proceeded to Casey's Bar for a birthday party for a friend named Kim and continued drinking until the bar closed at 2 a.m. Afterwards, they went with a group of people to another party where they consumed more alcohol. Monica testified that they were all drunk.

At some point during the last party, Monica noticed Anderson talking with another woman, and Monica became jealous and angry. Monica confronted the woman and began to choke her. A friend was able to pull Monica away, but moments later, Monica saw Anderson talking with the woman again, so Monica rushed over and hit the woman four or five times. Monica and Anderson started to argue, but Monica testified that she decided to leave to avoid any more fighting. She walked away from the party and asked her friend, Georgia, to pick her up. Monica later called the Andersons' home and told Anderson's mother that Monica would stay at Georgia's home for the night. Anderson's mother assured Monica that the children were all right.[1]

By the time of Monica's phone call to Anderson's mother, Anderson had already returned home. He told his father about the fight with Monica, and Anderson and his father went outside to smoke. Anderson's father testified that Anderson said that he was going to go look for Monica.

Around 3 a.m. that same night, B.A. called, asking her father if he could pick her up from the party. Anderson's father went to get his car keys from the bedroom, and as he came out, he saw Anderson drive the green Cadillac away from the house. Anderson's parents did not check on A.G. before Anderson left the house, but at some point during the night, Anderson's father looked in A.G.'s bedroom and did not see A.G. inside.

Though Anderson did not testify at trial, his recorded statements on October 5 to Agent Daniel Baumann of the Minnesota Bureau of Criminal Apprehension were placed on the record. Anderson told Baumann that when he left to look for Monica that night, he took A.G. with him. He stated that A.G. was not in a car seat during the ride. Without knowing Monica's location, Anderson drove to Georgia's house, where Monica was actually staying, and knocked on the door, but nobody answered. Georgia's boyfriend testified that he heard the knocking around 4 a.m. and went outside, just in time to see a green Cadillac drive away.[2]

A newspaper delivery person testified that she saw a teal-colored Cadillac pull into the Andersons' driveway around 4:50 a.m. The delivery person stated that she saw a young man walking toward the house, carrying a child who appeared to be awake.

Anderson recalled to Agent Baumann that after arriving home, he changed A.G.'s diaper and spilled baby powder while he was changing the baby. Anderson also stated that he placed A.G. in the playpen before going to sleep. Anderson's father, however, testified that while he was getting ready for work around 5:15 a.m., he saw Anderson and A.G. both sleeping in Anderson's room. Anderson's father stated that he woke Anderson up because A.G. was sleeping too close to the edge of the bed, that Anderson nudged A.G., and that A.G.

---

1. Anderson's mother had put A.G. to bed around 9 p.m., and D.G. slept with Anderson's parents that night. Anderson's mother testified that she did not notice any injuries or bruises on A.G. when she put him to bed.

2. Anderson also looked for Monica at Kim's house. Kim's son, Adam, testified that, during the early morning hours of October 5, he

was awakened by Anderson's loud pounding at the door. Anderson asked for the cell phone numbers of Kim and the woman who Monica had attacked earlier that night, but Kim's son gave incorrect numbers to Anderson. After pacing for a while, Anderson returned to the green Cadillac and drove away.

started to crawl toward the back of the bed.

Anderson told Agent Baumann that the next thing he remembered was awaking to find that A.G. felt cold to the touch and that A.G.'s skin was a different color. Anderson's panic woke his mother, and she called 911 while Anderson tried to give CPR. Police Chief Steven Rensvold, a sergeant at the time, arrived on the scene at 9:06 a.m. and found that A.G. had no pulse and that there was blood around A.G.'s mouth and forehead. Rensvold also noted that A.G. felt cool to the touch and that there were signs of injuries to A.G.'s cheek, head, and back. The paramedics brought A.G. to the hospital, where doctors pronounced him dead.

The medical examiner testified that "blunt force trauma to the head" caused A.G.'s death. The final autopsy protocol listed multiple blunt force injuries to the head as well as other contusions and abrasions on A.G.'s body. The medical examiner estimated that A.G. could have been alive for at least 35 minutes, if not more, after sustaining his injuries but that A.G. had been dead for two to four hours before police arrived at the Andersons' house.

A grand jury indicted Anderson on five counts of first-degree murder and two counts of second-degree murder.[3] In May 2007, a jury found Anderson guilty of first-degree murder while committing domestic abuse and unintentional second-degree murder while committing or attempting to commit a felony offense. The jury found Anderson not guilty of first-degree premeditated murder, three counts of first-degree murder while committing kidnap-

ping, and second-degree intentional murder. The district court sentenced Anderson to life imprisonment on the first-degree murder while committing domestic abuse charge. This direct appeal follows.

## I.

We turn first to Anderson's argument that the district court erred in admitting, over his objection, the testimony of three witnesses who described Anderson's prior behavior. The State argued, and the district court held, that the evidence was relevant to prove the element of past pattern of domestic abuse.

■ A district court's rulings on evidentiary matters will not be reversed absent a clear abuse of discretion. *State v. Nunn,* 561 N.W.2d 902, 906–07 (Minn.1997). Anderson has the burden to prove both that the trial court abused its discretion and that he was thereby prejudiced. *Id.* at 907. We will reverse "only when the error substantially influences the jury's decision." *Id.; see also State v. Valtierra,* 718 N.W.2d 425, 435 n. 4 (Minn.2006) (applying this harmless error test when constitutional rights are not implicated).

Anderson was convicted of domestic-abuse homicide. Minn.Stat. § 609.185(a)(6) (2008) ("Whoever does any of the following is guilty of murder in the first degree ... (6) causes the death of a human being while committing domestic abuse...."). One of the elements of domestic-abuse homicide is that "the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member." *Id.* Because a past pattern of domestic abuse

---

3. Anderson was indicted for first-degree murder (premeditation), Minn.Stat. § 609.185(a)(1) (2008); three counts of first-degree murder (kidnapping), Minn.Stat. §§ 609.185(a)(3), 609.25, subd. 1(1), (2), (3) (2008); first-degree murder (domestic abuse),

Minn.Stat. § 609.185(a)(6) (2008); second-degree murder (intentional), Minn.Stat. § 609.19, subd. 1(1) (2008); and second-degree murder (felony murder), Minn.Stat. §§ 609.19, subd. 2(1), 609.221, subd. 1 (2008).

is an element of domestic-abuse homicide, we have held that the State's burden is to prove the past pattern beyond a reasonable doubt, not the individual acts that comprise the pattern. *State v. Cross,* 577 N.W.2d 721, 727 (Minn.1998). We also stated in *Cross* that evidence of prior domestic abuse is admissible in a trial for past-pattern purposes "if it is relevant to establishing the past pattern of abuse, and its probative value is not 'substantially outweighed' by the danger of unfair prejudice." *Id.* at 725–26 (citing Minn. R. Evid. 401, 403). We held that past-pattern evidence does not fall under Minn. R. Evid. 404(b) (listing requirements for admission of other crimes, wrongs, or acts evidence) and does not have to satisfy a clear and convincing standard before it is admitted at trial. *Id.* at 725.

Though the State offered several pieces of past-pattern evidence, Anderson limits his appeal to the following three instances: testimony by Monica about an incident at Legends Bar; testimony by L.W., Anderson's former girlfriend, about two incidents at Anderson's house; and testimony by D.A., Anderson's brother, about the second incident involving L.W. For all three pieces of evidence, the district court instructed the jury that they could only use the testimony "in determining if a past pattern of domestic abuse exists." We turn to an examination of each instance challenged by Anderson.

### A.

■ The jury first heard testimony by Monica that she and Anderson were drinking at Legends Bar on a summer night in 2006. Monica stated that Anderson wanted to leave, but she wanted to stay. She testified that Anderson "jerked me off my chair and was pushing me out the door." When asked how she left the bar, Monica said that Anderson "drug me out of the

bar the first half and then pushed me the second half." Although she stated that she did not feel physical pain, she was embarrassed and left with Anderson because she "knew better than to act like that." Anderson contends that this incident was not admissible to show that he had engaged in a past pattern of domestic abuse. Specifically, he contends that the incident at Legends Bar was not an act of domestic abuse or assault, but was simply a disagreement.

"Domestic abuse," as it is used in the domestic-abuse-homicide statute, is defined in Minn.Stat. § 609.185(c) (2008). Domestic abuse means an act amounting to assault, criminal sexual conduct, terroristic threats, or similar acts. Minn.Stat. § 609.185(c)(1). This definition includes assault in the fifth degree and domestic assault. *Id.* Under both crimes, an act constitutes assault if a defendant either "(1) commits an act with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflicts or attempts to inflict bodily harm upon another." Minn.Stat. §§ 609.224, subd. 1, 609.2242, subd. 1 (2008).

We have recognized that, because "proof of prior incidents of domestic abuse is necessary to establish an element of the crime charged, . . . the state must be allowed to offer relevant evidence." *Cross,* 577 N.W.2d at 725. Dragging or pushing a person could meet the statutory definition of assault if the act was done in order to cause fear of immediate bodily harm or if the act did cause or attempted to cause bodily harm. That Monica testified that she did not feel any physical pain and was embarrassed by the incident does not mean, as Anderson seems to argue, that his behavior was not an assault under the statutory definitions. Based on Monica's testimony, the jury could have concluded that Anderson dragged her out of the bar

with the intent to frighten her or with the intent to inflict bodily harm on her. *See* Minn.Stat. §§ 609.224, subd. 1, 609.2242, subd. 1 (2008). Monica's testimony was therefore relevant to establish that Anderson committed an act of domestic assault. *See* Minn. R. Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

■ Any danger of unfair prejudice does not substantially outweigh the probative value of this evidence. Anderson had a full opportunity to cross-examine Monica and to argue on summation that this particular incident was not in fact an incident of domestic abuse. Because this evidence was relevant and its probative value was not outweighed by unfair prejudice, we hold that the district court did not abuse its discretion by admitting Monica's testimony about the incident at Legends Bar. *Cross*, 577 N.W.2d at 725–26 (citing Minn. R. Evid. 401, 403).

### B.

■ The second and third incidents that Anderson challenges are related. The second incident involves L.W., his former girlfriend, and the third incident involves L.W. and Anderson's brother, D.A. Because these incidents are related, we address them together.

L.W. testified that she and Anderson dated and had a sexual relationship during the summer of 2003. She testified that, on one occasion, she tried to go to a bar with her friends. Anderson did not want L.W.

to leave his home and pushed her against the wall behind his bedroom door to keep her from leaving the room. She testified that she was hurt and scared by Anderson's actions. After about 30 seconds, L.W.'s friend knocked on the bedroom door and asked if they could leave. Anderson let her go, and L.W. left with her friends.

The third incident occurred the following day when L.W. returned to retrieve her car from the Andersons' house. She walked into the house to talk to Anderson, and again, he kept her from leaving. This time, while she was sitting on the bed, Anderson forced her down and held her by the arms to keep her from getting up. After about a minute, Anderson's father came into the bedroom and made Anderson let L.W. go. L.W. quickly left and headed towards her car, but Anderson followed her. She testified that as she was running to her car, Anderson's brother, D.A., was in the front yard. She stated that D.A. tried to stop Anderson with his hands and that Anderson punched his brother in order to follow L.W. to the car. D.A. remembered the incident differently. He testified that when L.W. was in the car, Anderson stood by her car door asking her to stay. D.A. said that he grabbed Anderson and carried him back to the yard so L.W. could leave. D.A. testified that punches were thrown and that, at one point, he tackled Anderson to stop him from getting to L.W.'s car.

In challenging the admission of this evidence, Anderson characterizes his relationship with L.W. as a mere summer fling instead of a significant romantic or sexual relationship.[4] He also depicts the fight he

4. One element of domestic-abuse homicide is a past pattern of domestic abuse against family or household members, which include persons involved in a significant romantic or sexual relationship with the defendant.

Minn.Stat. § 518B.01, subd. 2(b) (2008); *see also* Minn.Stat. § 609.185(c)(2) (2008). Under Minn.Stat. § 518B.01, subd. 2(b), the following factors determine if a relationship qualifies as a significant romantic or sexual

and D.A. had as merely a scuffle between brothers, not amounting to a previous incident of domestic abuse. Anderson also argues that the incidents involving L.W. and D.A. happened three years before the death of A.G., and therefore these incidents are too remote in time to demonstrate a past pattern.

The State responds that Anderson's altercation with D.A. must be viewed in the context of Anderson's assault against L.W. and that the significance of Anderson's relationship with L.W. is a question for the jury. Further, the State contends that admitting the evidence was not an abuse of the district court's discretion. In the alternative, the State argues that even if the evidence was admitted in error, the error was harmless. We need not decide whether the district court abused its discretion in admitting L.W. and D.A.'s testimony because we agree with the State that even if there was error, any error was harmless.

■ We will reverse a district court's evidentiary ruling only if the error substantially influenced the jury's decision. *Nunn*, 561 N.W.2d at 907. Anderson has the burden to prove that he was prejudiced by the error. *See id.* We recently applied harmless-error analysis in a case in which we concluded that the district court erred in admitting evidence offered to show the past-pattern element. *See State v. Goelz*, 743 N.W.2d 249, 256–58 (Minn.2007). In *Goelz*, we found that the error was harmless because the court gave a limiting instruction, the State presented other evidence of a past pattern, and the

erroneously admitted evidence was only a minor part of the State's evidence and argument. *Id.* We follow the same analysis in this case.

The district court in this case instructed the jury that the evidence as to Anderson's past behavior could not be used for any purpose other than determining whether Anderson committed the crimes at issue in the case. Before the evidence about each incident was received, the court cautioned the jury that the evidence it was about to hear could be used "only to assist you in determining if a past pattern of domestic abuse exists and you may not use it for any other purpose." And, in the final instructions, the court reminded the jury that "[t]he defendant is not being tried for and may not be convicted of any offence other than the charged offences." With these instructions, the court took steps to "reduc[e] potentially unfair prejudice" from the past pattern evidence. *Goelz*, 743 N.W.2d at 257.[5]

Moreover, even without the incidents described by L.W. and D.A., the State presented strong evidence to support the jury's finding of a past pattern of domestic abuse. *See Goelz*, 743 N.W.2d at 257 (concluding that error in admitting evidence that the victim secured an order for protection was harmless in part based on the strength of the other past-pattern evidence). The State presented evidence of four prior acts of domestic assault committed by Anderson over the course of just a few months before the murder. First, Mo-

relationship: "length of time of the relationship; type of relationship; frequency of interaction between the parties; and, if the relationship has terminated, length of time since the termination."

5. In its closing argument, the State also reminded the jury of the limited purpose for which the evidence was offered. The State argued: "When we put in evidence about past

pattern or past incidents of domestic abuse, it's not to make you think he's a bad guy, that we should convict him today because he's done other things in the past. So on occasion there are limited purposes that you can use evidence for and the Judge read you an instruction ... every time we did this kind of thing."

nica testified that A.G. suffered a bruise on his face in the summer of 2006. When she asked Anderson about the bruise, he admitted that he slapped A.G. across the face when A.G. knocked some books and other items from the television set. Second, Monica testified about Anderson dragging her from Legends Bar, which also happened in the summer of 2006. Third, Monica testified that on August 15, 2006, Anderson assaulted her by pulling her hair, jumping on her back, and tripping her. Fourth, Monica testified, and the State presented supporting photographs, that on September 9, 2006, Anderson assaulted Monica by hitting, choking, and biting her.[6]

These four incidents occurred in close proximity to the murder and in close proximity to each other. *See State v. Clark,* 739 N.W.2d 412, 421 (Minn.2007) ("While we have declined to add a specific temporal requirement to the separate acts of domestic abuse, we have held that 'the events must be sufficiently proximate in time to constitute a "pattern." ' " (quoting *Cross,* 577 N.W.2d at 727 n. 3)). The events are also similar in that they involve Anderson's angry, controlling behavior meted out to members of his family unit, Monica and her child. *Cross,* 577 N.W.2d at 727 n. 3 ("[A] 'pattern' must involve some number of events which bear sufficient relationship to establish a similarity or principle around which they are organized."). Based on the four incidents set forth above establishing Anderson's specific acts of domestic abuse against A.G. and Monica, the State demonstrated that Anderson's regular way of acting was to commit domestic abuse against his family members, even without reference to the testimony of L.W. and D.A. *See Clark,*

739 N.W.2d at 419 (recognizing that "a pattern 'suggests a regular way of acting by committing acts of domestic abuse.' " (quoting *State v. Robinson,* 539 N.W.2d 231, 237 (Minn.1995))).

Finally, the State did not overemphasize the evidence offered by L.W. and D.A. during closing argument. The State made only limited reference to this evidence in a 48–page closing argument. *Id.* (noting that State made "only limited reference" to the erroneously admitted evidence in closing argument).

For all of these reasons, we conclude that Anderson has not shown that any error in the admission of testimony from L.W. and D.A. substantially influenced the jury's decision to find Anderson guilty, and we therefore hold that the admission of this evidence, if in error, was harmless.

## II.

Anderson submitted a two-page pro se supplement brief. He raises several claims of ineffective assistance of counsel. Anderson claims that his trial counsel failed to address child restraint laws and the possibilities that A.G. may have been injured by riding in Anderson's car without a seat belt or by falling when Anderson tripped in a visit to his trailer the night of October 4. Anderson also claims that counsel should have requested a change of venue. Further, he contends that his statements to Agent Baumann were made under emotional distress. Finally, Anderson argues that Chief Deputy Fiedler and Det. Sgt. Butenhoff tailored their testimony at trial with regard to the

---

**6.** Anderson argues that the jury instructions given for the incidents on August 15 and September 9 were confusing. But Anderson does not contend that the jury instructions were erroneous, and he provides no support for his argument that the jury did not consider these incidents when they found a past pattern of domestic abuse beyond a reasonable doubt.

bloody clothes found at the Andersons' house.

██ "We will not consider pro se claims on appeal that are unsupported by either arguments or citations to legal authority" if no prejudicial error is obvious on mere inspection. *State v. Bartylla,* 755 N.W.2d 8, 22–23 (Minn.2008). Because Anderson's pro se arguments lack support and legal authority and because no prejudicial error is obvious on mere inspection of the claims, Anderson has waived his pro se claims. *See id.*

Affirmed.