ANDERSON, Justice.
A Clay County jury found appellant Gerald Robinson guilty of felony domestic assault under Minn. Stat. § 609.2242, subd. 4 (2018). On appeal, Robinson argued that the evidence was insufficient to prove that he and the victim were "persons involved in a significant romantic or sexual relationship" at the time of the offense. Minn. Stat. § 518B.01 subd. 2(b)(7) (2018). The court of appeals held that the phrase "significant romantic or sexual relationship" is unambiguous, applied the plain meaning, and affirmed Robinson's conviction. State v. Robinson , No. A17-0525, 2018 WL 414327, at *3 (Minn. App. Jan. 16, 2018). We agree with the analysis of the court of appeals and therefore affirm.
FACTS
The victim in this case, C.P., met Robinson in March 2016 at a homeless shelter in Moorhead, and the two began dating. Because C.P. was employed by the shelter, both she and Robinson concealed the dating relationship. At the time, C.P. was and had been living with the same man, D.Z., for more than 12 years. C.P. claimed at trial that D.Z. was just her roommate, even though others thought of him as her husband. C.P. lied to D.Z. to spend time with Robinson.
In June 2016, C.P. and Robinson rented a hotel room together for a few days, which led to C.P.'s relapse after 14 years of sobriety. Coworkers of C.P. told her family that Robinson and C.P. had become close, and C.P. told her sister that she was attracted to Robinson. C.P.'s sister testified at trial that C.P. and Robinson had been seen "sneaking around" in parks together, and C.P. confirmed this behavior to her.
*757 Robinson and C.P. rented another hotel room in July 2016, and C.P. relapsed again. C.P.'s family, with whom she communicated daily, became concerned when they did not hear from her for 24 hours and learned that she had missed several shifts at work. After two days without any contact, C.P.'s niece filed a missing person's report. On the same day the report was filed, C.P.'s vehicle was located in the parking lot of a hotel in Moorhead, and C.P.'s sister, daughter, and a coworker met a Moorhead police officer at the hotel. When they found C.P. and Robinson together in a hotel room, C.P. had a bruise near her eye, a "goose egg" sized bump on her temple, and multiple lacerations on the left side of her face. When C.P. slowly came out of the room, she struggled to walk on her own, seemed very impaired, and was crying and shaking. C.P. had been with Robinson in the hotel room, intoxicated and with no food, for five days. Robinson was arrested at the hotel.
The day after Robinson's arrest, the officer went to C.P.'s house to speak with her. She described Robinson as more than a friend and admitted to having sexual intercourse with him multiple times. C.P. told the officer that, although she did not consider Robinson to be her boyfriend, she was falling in love with him. She further said that she had been dating Robinson for only the "past couple of weeks."
At trial, C.P.'s testimony suggested that she had known Robinson for about 4 months before the incident. She testified that, at the time of the last hotel stay, their relationship was "an ongoing-trying to be-figure out what[-]where our relationship was going to go." C.P. testified that she cared about Robinson, and he cared about her, but their relationship was in the "beginning process." Further, she testified that she loved him. She testified that they had been "intimate" at certain times and were keeping the relationship a secret because she was employed at the shelter where Robinson was a client. C.P. testified that she was not appearing at trial voluntarily but had been served with a subpoena by the State. In addition to the loss of sobriety, C.P. had ended contact with her family. She also missed shifts at her job due to the hotel stay and violated shelter policies prohibiting relationships between advocates and clients.
Robinson did not testify during the trial, but his attorney referred to C.P. as Robinson's "lover" during opening and closing arguments.
The jury found Robinson guilty of felony domestic assault under Minn. Stat. § 609.2242, subd. 4. The statute requires "intentionally inflict[ing] ... bodily harm" "against a family or household member as defined in Minn. Stat. § 518B.01, subd. 2." Minn. Stat. § 609.2242, subd. 1 (2018).
Under Minn. Stat. § 518B.01, subd. 2, the Domestic Abuse Act, the definition of a "family or household member" includes someone with whom the defendant has a "significant romantic or sexual relationship." Minn. Stat. § 518B.01, subd. 2(b)(7). Although the term "significant" is not specifically defined, the statute directs courts to "consider the length of time of the relationship; type of relationship; frequency of interaction between the parties; and, if the relationship has terminated, length of time since the termination" to determine whether the statutory relationship exists. Id. , subd. 2(b).
At the court of appeals, Robinson argued that the evidence was insufficient for the jury to find that he and C.P. were engaged in a "significant romantic or sexual relationship" at the time of the offense. Robinson asserted that the plain language of the statute includes only "important, momentous, and special romantic or sexual relationships." Robinson also contended *758 that because C.P. did not consider him to be her boyfriend at the time of the offense, they had never stayed at each other's homes, their children did not know each other, and they had known each other for only 4 weeks, their relationship was not "significant."
The court of appeals held that a "significant romantic or sexual relationship" must be analyzed on a case-by-case basis using the factors set forth in Minn. Stat. § 518B.01, subd. 2. Robinson , 2018 WL 414327 at *3. The court of appeals looked to the length, frequency, and intensity of the relationship between Robinson and C.P. Id. It held that no specific length of time or type of interaction is dispositive. Id. Applying this plain-meaning interpretation of the phrase "significant romantic or sexual relationship," the court of appeals reviewed the evidence in the light most favorable to Robinson's conviction and affirmed, holding that the evidence was sufficient for a jury to find that C.P. and Robinson were in a "significant romantic relationship" at the time of the offense. Id.
We granted Robinson's petition for further review.
ANALYSIS
Our review of this decision involves a two-step process. First, we must interpret the meaning of "significant romantic or sexual relationship." Second, we must determine whether the evidence presented was sufficient to support the jury's finding that Robinson and C.P. were in a "significant romantic or sexual relationship" when the offense occurred.
Robinson argues that the plain language of the statute and the dictionary definitions of "significant" are ambiguous. He contends that the phrase "significant romantic or sexual relationship" must be interpreted narrowly to include only long-term, exclusive, serious, mutually committed relationships. Robinson asserts that the evidence was insufficient to prove that he was in a significant relationship with C.P. at the time of the offense.
I.
We first must interpret the statute before we can determine whether the evidence was sufficient to support the jury verdict. See State v. Vasko , 889 N.W.2d 551, 556 (Minn. 2017). When interpreting a statute, our goal "is to ascertain and effectuate the intent of the Legislature." State v. Henderson , 907 N.W.2d 623, 625 (Minn. 2018). We read the "statute as a whole" to "give effect to all of its provisions." Id. The preliminary step in statutory interpretation is to determine whether the language, on its face, is ambiguous. Id. If the language is unambiguous, we will apply its plain meaning. Larson v. State , 790 N.W.2d 700, 703 (Minn. 2010).
A.
Although the Domestic Abuse Act does not define the word "significant," it does provide as follows: "In determining whether persons are or have been involved in a significant romantic or sexual relationship under clause (7), the court shall consider the length of time of the relationship; type of relationship; frequency of interaction between the parties; and, if the relationship has terminated, length of time since the termination." Minn. Stat. § 518B.01, subd. 2(b).
Robinson argues that these statutory factors from the civil Domestic Abuse Act, Minn. Stat. § 518B.01, subd. 2(b), were never intended to be incorporated into the criminal statute, Minn. Stat. § 609.2242. We are not persuaded by Robinson's argument.
First, Minn. Stat. § 645.31, subd. 1 (2018), provides that
*759 [w]hen a section or part of a law is amended, the amendment shall be construed as merging into the original law, becoming a part thereof, and replacing the part amended, and the remainder of the original enactment and the amendment shall be read together and viewed as one act passed at one time....
Minnesota law also requires that "[w]hen an act adopts the provisions of another law by reference[,] it also adopts by reference any subsequent amendments of such other law, except where there is clear legislative intention to the contrary." Minn. Stat. § 645.31, subd. 2 (2018).
Here, when the Legislature enacted the domestic-assault statute, it explicitly included the language "against a family or household member as defined in section 518B.01, subdivision 2." Minn. Stat. § 609.2242, subd. 1 (emphasis added). By enacting this provision, the Legislature incorporated the definition in the Domestic Abuse Act, and any subsequent amendments of that act, into the criminal statute. Because the entirety of section 518B.01, subdivision 2, is incorporated into the criminal statute, the original enactment of section 518B.01, subdivision 2(b)(1)-(6), and the later addition of paragraph (b)(7) "shall be read together and viewed as one act passed at one time." Minn. Stat. § 645.31, subd. 1. All of the language in paragraph (7) was added to § 518B.01, subd. 2(b) at one time and therefore must be read together. See Act of May 25, 1995, ch. 226, art. 7, § 3, 1995 Minn. Laws 1881-82 (codified as amended at Minn. Stat. § 518B.01, subd. 2(b)(7) (2018) ). Because the phrase "significant romantic or sexual relationship" is incorporated into the statute, the list of factors used to determine the existence of that relationship is incorporated into the domestic-assault statute as well.
Second, the phrase "significant romantic or sexual relationship" must be read in the context of its surrounding language.[1] "Language, of course, cannot be interpreted apart from context. The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it." Smith v. United States , 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). The statutory list of factors serves as a definition, or at the very least, an explanation of what the phrase "significant romantic or sexual relationship" means. The State correctly relies on our decision in State v. Anderson , where we addressed an evidentiary issue in a domestic-assault case and stated that the list of statutory factors in section 518B.01, subdivision 2(b), should be considered. See 763 N.W.2d 9, 14-15 n.4 (Minn. 2009). In Anderson , we reviewed the relevant facts surrounding the relationship of the appellant and the victim, which the appellant argued was a "mere summer fling," and explained in a footnote that the statutory factors determine whether a relationship qualifies as a "significant romantic or sexual relationship."[2] Id.
*760 When looking at the domestic-assault statute as a whole, we agree with the State that we must consider the list of statutory factors in Minn. Stat. § 518B.01, subd. 2(b), to determine whether a "significant romantic or sexual relationship" existed.
B.
Robinson also argues that the phrase "significant romantic or sexual relationship" is ambiguous because "[t]he statute does not define any of the words in the phrase.... Nor does [it] provide a list of examples of the kinds of relationships or statuses [that] might qualify." Further, he contends that dictionary definitions provide little help. We disagree.
When a statute does not define a specific phrase or word, we often look to dictionary definitions to discern the plain meaning. See Minn. Stat § 645.08(1) (2018) ; Shire v. Rosemount, Inc. , 875 N.W.2d 289, 292 (Minn. 2016). In the context of this statute, "significant" means "having or likely to have influence or effect: ... important, weighty, notable." Webster's International Dictionary Unabridged 2116 (3d ed. 1961). Robinson argues that the dictionary definition of "significant" is ambiguous and provides us with no assistance to interpret its meaning within the statute. The State argues that this definition must be read together with the factors in the statute.
Although the Legislature has provided a list of statutory factors to determine whether a relationship is significant, we agree with the State that the dictionary definition of that term confirms the plain meaning of the statute. We reject, however, the State's argument that "significant" modifies only "romantic," leaving the term "sexual" to identify a distinct type of relationship. The practical effect of the State's argument would be that any sexual relationship would qualify as a "significant" relationship under the statute. The State's strained interpretation ignores basic grammar rules, leads to an illogical reading of the phrase, and relies on an overinclusive standard.
Simply because the phrase "significant romantic or sexual relationship" may include more than one type or length of relationship does not mean that the phrase is ambiguous on its face. We conclude that the phrase "significant romantic or sexual relationship" is unambiguous and the plain meaning of that phrase is understood by reference to the statutory factors set forth in the Domestic Abuse Act, Minn. Stat. § 518B.01 subd. 2(b) : "length of time of the relationship; type of relationship; frequency of interaction between the parties; and, if the relationship has terminated, length of time since the termination."
C.
Finally, Robinson argues that the phrase "significant romantic or sexual relationship" must be interpreted narrowly to avoid unconstitutional vagueness.[3] The *761 State, noting that Robinson did not make a vagueness argument before either the district court or the court of appeals, claims that this argument was forfeited. Robinson did not forfeit the argument that we must interpret the statute by applying the canon of constitutional avoidance, specifically, by interpreting the statutory language to avoid an unconstitutionally vague meaning. See Vasko , 889 N.W.2d at 555-56. But, since we conclude that the plain meaning of the statute controls and that the statutory language is not ambiguous, we need not consider the canon of constitutional avoidance. See, e.g. , Leiendecker v. Asian Women United of Minn ., 848 N.W.2d 224, 232-33 (Minn. 2014) (rejecting a proposed interpretation of the statute based on the constitutional-avoidance canon as inconsistent with the plain language of the statute).
In summary, we reject the State's broad interpretation that a sexual relationship is automatically "significant," and we also reject Robinson's narrow interpretation that a relationship is "significant" only when the relationship is long-term, exclusive, and mutually committed. Determining whether two persons are involved in a "significant romantic or sexual relationship," for the purposes of the domestic-assault statute, requires a case-by-case analysis using the statutory factors of Minn. Stat. § 518B.01, subd. 2, including the length of the relationship, the type of relationship, and the frequency of interactions between the two persons.
II.
We next turn to whether the evidence presented was sufficient for the jury to find that Robinson and C.P. were in a "significant romantic or sexual relationship." We review the evidence in the light most favorable to the conviction. State v. Hanson , 800 N.W.2d 618, 621 (Minn. 2011) ; State v. Pendleton , 759 N.W.2d 900, 909 (Minn. 2009). We defer to the jury, which is "generally in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony." Hanson , 800 N.W.2d at 622 (citation omitted) (internal quotation marks omitted). We analyze the evidence using the statutory factors to determine whether Robinson's relationship with C.P. was significant: the length of the relationship, the type of relationship, and the frequency of interactions between C.P. and Robinson. We also look to the meaning the relationship had to Robinson and C.P. and the effect that the relationship had on them in light of the plain meaning of the statutory phrase.
Robinson argues that because C.P. did not refer to him as her boyfriend and because they were still trying, as C.P. testified, "to figure out" their relationship, the evidence is insufficient to prove that their relationship was "significant." He also argues that the significance of the relationship was not mutual, it was not long enough, and it lacked other characteristics of a significant relationship, such as interacting with each other's families, attending dinners or social events together, or leaving personal belongings with the other person.
The State argues, and the evidence shows, that Robinson and C.P. were involved in a sexual relationship for at least 1 month before the offense. They had been on multiple dates, interacted with each other at the homeless shelter, and stayed in a hotel room together for multiple *762 nights on two different occasions in June and July 2016. After the offense, C.P. told the investigating officer that she was falling in love with Robinson and believed that Robinson cared for her. Robinson did not testify during the trial, and the characterization of the relationship offered by C.P. was undisputed. Further, C.P. testified at trial that she still loved Robinson.
Finally, the consequences of the relationship to the parties demonstrate its significance. C.P.'s relationship with Robinson led to her relapse after 14 years of sobriety and also to miss multiple work shifts. It caused her to keep secrets from her coworkers, lie to the man that she had lived with for over a decade, and to "sneak around" with Robinson. C.P. also cut ties with many close members of her family with whom, before the relationship and assault, she spoke to frequently, if not every day. These consequences flowing from the interactions between C.P. and Robinson support a factual finding that Robinson and C.P. were in a significant romantic or sexual relationship.
Robinson also relies on other decisions to support his narrow interpretation of a "significant" relationship, but his reliance on these decisions is improper. Those cases involved relationships that fell into different statutory categories of "family or household member[s]," such as "persons who are presently residing together or who have resided together in the past" and "persons who have a child in common regardless of whether they have been married or have lived together at any time." Minn. Stat. § 518B.01, subd. 2(b)(4)-(5) (2018) ; see Gulbertson v. State , 843 N.W.2d 240, 243, 245 n.6 (Minn. 2014) (explaining that the defendant and the victim "were involved in a romantic relationship for several years," lived together, and thus were "family or household members" under the statute); State v. Clark , 739 N.W.2d 412, 415, 418 (Minn. 2007) (explaining that the defendant and the victim "had been together as a couple for about 16 years" and relying in part on family-household member provision).
Taking the evidence in the light most favorable to the conviction, we conclude that the evidence was sufficient for the jury to find that C.P. and Robinson were in a "significant romantic or sexual relationship" at the time of the offense.[4] Fundamentally, the jury verdict here turns on the credibility of the witness testimony. Although C.P. testified inconsistently regarding the length of her relationship with Robinson, we give deference "to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." State v. Andersen , 784 N.W.2d 320, 329 (Minn. 2010). The evidence in the record is sufficient to support the jury's finding that Robinson and C.P. were in a "significant romantic or sexual relationship" when the assault occurred.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals.
Affirmed.

Often, a question of sufficiency of the evidence will be raised in the context of a challenge to a jury instruction. Because trial counsel did not object to the jury instructions, we need not decide whether the failure to provide the list of statutory factors to the jury was error. Nonetheless, we note that the factors provide context, clarity, and guidance to the jury when determining whether a "significant romantic or sexual relationship" existed and, in appropriate circumstances, a district court should consider including the factors in the jury instructions. Although the jury was not specifically instructed about the statutory factors, the parties argued throughout the trial about the duration and type of relationship and interactions between C.P. and Robinson.

The Domestic Abuse Act has been incorporated into several other criminal statutes, and some of the incorporations occurred years before the Domestic Abuse Act was incorporated into the felony domestic-assault statute, Minn. Stat. § 609.2242. See Act of April 27, 1992, ch. 537, § 1, 1992 Minn. Laws 1381 (codified as amended at Minn. Stat. 609.224, subd. 2 (1994) ) (domestic-assault statute, later was replaced with separate domestic-abuse statute in 1995); Act of May 3, 1990, ch. 583, § 4, 1990 Minn. Laws 2201-02 (codified as amended at Minn. Stat. § 609.185 (e) (2018) ) (domestic-abuse murder statute).

Robinson argues that the statute is better interpreted to include only long-term, exclusive, serious, mutually committed relationships. But the language Robinson urges us to adopt is not the language the Legislature enacted. It is certainly reasonable to argue, and Robinson so argued throughout the trial, that the types of relationships Robinson describes are covered by the statute, but the plain language of the statute does not exclude other relationships. The court of appeals correctly recognized in an earlier decision that the statute "does not expressly require the type of formalized or committed relationships" suggested by Robinson's argument. See State v. Holmes , No. A13-2153, 2014 WL 5800336, at *2 (Minn. App. Nov. 10, 2014), rev. denied (Minn. Jan. 28, 2015).

Robinson's reliance on our reference in Anderson to the description of the relationship as a "summer fling" is misplaced. See 763 N.W.2d at 14. We did not address the sufficiency of the evidence in that case, but instead decided an evidentiary issue under a harmless-error standard. Id. at 16.