STATE of Minnesota, Respondent,

v.

Jonathan SANDERS, Appellant.

No. A06–1354.

Supreme Court of Minnesota.

Dec. 17, 2009.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Susan Gaertner, Ramsey County Attorney, Mitchell L. Rothman, Assistant County Attorney, St. Paul, Minnesota, for respondent.

Benjamin J. Butler, Assistant State Public Defender, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

 In this appeal we consider whether the district court committed reversible error when it admitted testimony regarding statements allegedly made by appellant Jonathan Sanders during an unrecorded out-of-state custodial interrogation conducted by the FBI at a place of detention. Sanders was convicted of first-degree criminal sexual conduct, Minn.Stat. § 609.342, subd. 1(a) (2008), involving the 11–year–old daughter of his girlfriend. Sanders appealed his conviction to the court of appeals, arguing in part that the district court committed reversible error when it admitted testimony regarding Sanders's unrecorded statements to the FBI. The court of appeals affirmed, holding as a matter of first impression, that the recording requirement announced in *State v. Scales*, 518 N.W.2d 587 (Minn.1994), did not apply to a custodial interrogation that is conducted outside Minnesota.[1] *State v. Sanders*, 743 N.W.2d 616, 620 (Minn.App. 2008). Based on our conclusion that the jury's verdict was surely unattributable to the district court's admission of testimony regarding Sanders's unrecorded statements to the FBI, we affirm.

---

1. *Scales* arose from cases involving defendants' constitutional rights against compelled self-incrimination and the procedures required by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See, e.g., State v. Robinson*, 427 N.W.2d 217, 222 (Minn.1988). Defendants and police often differ at trial over whether police followed *Miranda*, whether the defendant waived his or her right to remain silent, and whether the defendant knowingly and voluntarily confessed to the crime charged. *See id.* at 224 n. 5 (observing that many disputes over a defendant's constitutional rights would be avoided if police interrogators recorded all their conversations with a suspect). In *Robinson*, we recommended recording interviews, including pre-statement conversations. *Id.* Three years later, we "urge[d] ... law enforcement professionals [to] use those technological means at their disposal to fully preserve those conversations and events preceding the actual interrogation." *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). We warned law enforcement personnel and prosecutors that we would "look with great disfavor upon any further refusal to heed these admonitions." *Id.*

In *Scales*, we expressed our concern "about the failure of law enforcement officers to record custodial interrogations," because law enforcement officers ignored our warnings in *Pilcher* and *Robinson*. *Scales*, 518 N.W.2d at 591–92. Exercising our supervisory power to insure the fair administration of justice, we held that all custodial interrogation "shall be electronically recorded where feasible." *Id.* at 592. This was to include any information given to suspects about rights, any waiver of those rights, and all questioning. *Id.* If police failed to record, then suspects' statements "may be suppressed at trial." *Id.* Exclusion was to be decided on a case-by-case basis. *Id.* For violations deemed "substantial," suppression was required. *Id.* Conversely, suppression was not required for an insubstantial *Scales* violation.

At trial, the State presented the following evidence. In October 2004 Sanders was living with his girlfriend S.J. and her daughter B.J. in St. Paul. On October 29, 2004, Sanders was home alone with B.J. Sanders was 28 years old, and B.J. was 11. Sanders considered B.J. his stepdaughter, having helped raise her since she was five years old. B.J. was on a living room sofa watching television when Sanders sat next to her and, according to B.J., began to touch the clothing over his penis with one hand while touching B.J.'s buttocks with his other hand. B.J. testified that she went to her bedroom, partially closed the door, and got into bed. Sanders entered B.J.'s room a few minutes later and got into bed with her. Sanders removed his pants, removed B.J.'s pants and underwear, got on top of B.J., and rubbed his penis between B.J.'s gluteal folds, or butt cheeks. He masturbated, used a towel to wipe off B.J.'s buttocks and himself, and left the room. B.J. fell asleep, and Sanders was gone when she awoke.

When her mother arrived home, B.J. told her what had happened. She also told her mother that Sanders had initiated sexual contact with her on two earlier occasions. S.J. called the St. Paul Police Department, and B.J. told police officers about the three incidents. B.J. was then interviewed and examined by a nurse at the Midwest Children's Resource Center. S.J. suggested to police that Sanders might have gone to Chicago.

After B.J. and her mother testified, the district court held a midtrial evidentiary hearing to determine whether to suppress statements made by Sanders to the FBI agents when they later apprehended Sanders in Chicago, Illinois. At the midtrial evidentiary hearing, Special Agent Sean Burke testified to the following facts. After the October 29, 2004, incident, the St. Paul Police Department issued a warrant for Sanders and contacted the Minneapolis office of the FBI for assistance in finding him.[2] The FBI Minneapolis office obtained an Unlawful Flight to Avoid Prosecution Warrant and contacted the Chicago FBI and asked for help in locating Sanders. An agent in the FBI's Chicago office ran a background check on Sanders, and on May 24, 2005, FBI agents and Chicago police officers were sent to the home of Sanders's mother. Agents found Sanders there, and took him to a Chicago Police Department booking station.

Burke and Special Agent Matthew Alcoke interviewed Sanders from 8:12 a.m. to 10 a.m.[3] The FBI agents did not record the session, because it is national FBI policy not to audiotape or videotape interviews. Burke was unaware of the recording requirement in Minnesota. Alcoke read Sanders his rights, while showing Sanders a preprinted FBI Advice–of–Rights form. Sanders orally indicated he understood, and agreed to be interviewed, but refused to sign the form. In refusing, Sanders told agents he did not want to sign anything. He asked no questions about the Advice–of–Rights form.

2. Sanders also used the alias "Johnny Knight." Sanders, testifying at his trial, stated his name was John Knight. He also had an Illinois state identification card bearing the name Johnny Knight.

3. The record is unclear as to why the FBI conducted the interview, and whether it did so at the request of the St. Paul Police Department. Alcoke did not testify at either the midtrial evidentiary hearing or the trial; Burke testified that he did not know how the interview was arranged. Sanders implies collusion between the St. Paul Police Department and the FBI in order to evade the recording requirement and requests a remand on the issue, but he fails to point to any facts in the record supporting his theory.

Sanders initially told the FBI agents that his date of birth was January 6, 1976, but later admitted that his true date of birth was January 6, 1978. Sanders also admitted that he sometimes used the name Johnny Knight. When the FBI agents asked Sanders whether Sanders had sexual intercourse or any other type of sexual contact with B.J., Sanders repeatedly gave the same response: "I did not f—— her." Sanders also stated that he would never have had sex with B.J., because he believed B.J. had a venereal disease based on an alleged vaginal odor. He further stated that he had smelled a similar vaginal odor when he was sexually active with an upstairs neighbor. Asked why his DNA would be in the house, Sanders told the agents he had masturbated throughout the house. Sanders refused the agents' request that he provide a Q-tip swab sample of his DNA. When the interview ended, the agents prepared a report on the Sanders interview on a standard FBI form. Then the agents turned Sanders over to the Chicago police to handle his extradition to Minnesota.

Based on Burke's testimony, the district court denied Sanders's suppression motion. It concluded that the recording requirements announced in *State v. Scales*, 518 N.W.2d 587 (Minn.1994), did not apply to a custodial interrogation that is conducted outside Minnesota. The district court further concluded that Sanders "knowingly, voluntarily, and freely waived his right to remain silent."

When the jury trial resumed, Burke testified to the facts outlined above. The State also presented expert testimony that Sanders could not be excluded as a source of the DNA found on the towel recovered from B.J.'s home. After the State's remaining witnesses testified, Sanders decided to testify at trial. He denied committing the offense. Sanders also denied making several of the statements that Burke attributed to him. He specifically denied giving the FBI agents a false date of birth, using the word "f——" during the FBI interview, and having sex with the upstairs neighbor.

During the State's closing argument, the State discussed Sanders's denial of the statements attributed to him by Burke. But, the State did not dwell on this issue; fewer than four pages of the State's closing argument were spent discussing Sanders's denial of the statements attributed to him by Burke. Instead, the State focused the argument on B.J.'s testimony and the DNA evidence.

During Sanders's closing argument, defense counsel used Burke's testimony to emphasize that Sanders immediately and consistently denied having sexual contact with B.J. Defense counsel further told the jury that they could acquit Sanders without labeling Burke a liar. Instead, the jury could simply say that the State's evidence was not enough to prove the charges beyond a reasonable doubt.

The jury found Sanders guilty of first-degree criminal sexual conduct. The district court imposed a presumptive 144–month sentence.

On appeal, Sanders challenged his conviction, arguing in part that the district court committed reversible error when it admitted Burke's testimony. As a matter of first impression, the court of appeals held that "the *Scales* recording requirement is a state procedural rule intended to govern conduct occurring within the state." *State v. Sanders*, 743 N.W.2d 616, 620 (Minn.App.2008). We granted Sanders's petition for review on the issue of whether the recording requirement announced in *Scales*, 518 N.W.2d 587, applies to custodial interrogation taken outside of Minnesota.

Sanders asserts that the district court and the court of appeals erred in concluding that the recording requirement announced in *Scales,* 518 N.W.2d 587, does not apply to a custodial interrogation that is conducted outside Minnesota. He also asserts that the district court was required to suppress his unrecorded statement to the FBI because the alleged *Scales* violation was substantial. Sanders further asserts that it is impossible to conclude that the jury's verdict was surely unattributable to the court's erroneous admission of Burke's testimony. Based on these assertions, Sanders contends that he is entitled to a new trial.

If the jury's verdict was surely unattributable to the district court's admission of Burke's testimony regarding the statements Sanders allegedly made to the FBI, we need not address whether the *Scales* recording rule applies to a custodial interrogation conducted outside Minnesota or whether the alleged *Scales* violation in this case was substantial. Consequently, we begin our analysis by considering whether the jury's verdict was surely unattributable to the district court's admission of Burke's testimony.

■ On appeal, a defendant has the burden of proving not only that the district court abused its discretion in admitting the evidence in question, but also that he was prejudiced by the admission of the evidence. *State v. Nunn,* 561 N.W.2d 902, 907 (Minn.1997) (citing *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994)). Depending on whether the district court's erroneous admission of evidence implicates a constitutional right, we have applied two different harmless-error tests for determining whether the defendant was prejudiced by the admission of the evidence. When the error implicates a constitutional right, a new trial is required unless the

State can show beyond a reasonable doubt that the error was harmless. *State v. Scott,* 501 N.W.2d 608, 619 (Minn.1993). An error is harmless beyond a reasonable doubt if the jury's verdict was surely unattributable to the error. *State v. Shoen,* 598 N.W.2d 370, 377 (Minn.1999). When the error does not implicate a constitutional right, a new trial is required only when the error substantially influenced the jury's verdict. *State v. Anderson,* 763 N.W.2d 9, 12 (Minn.2009); *State v. Darveaux,* 318 N.W.2d 44, 48 (Minn.1982). We have not squarely addressed whether a district court's erroneous admission of testimony regarding statements made by a defendant during an unrecorded custodial interrogation at a place of detention implicates a constitutional right.

In *Scales,* we chose not to determine "whether under the Due Process Clause of the Minnesota Constitution a criminal suspect has a right to have his or her custodial interrogation recorded." 518 N.W.2d at 592. Instead, we exercised our supervisory power to insure the fair administration of justice in announcing the *Scales* recording requirement. *Id.* Without identifying the applicable harmless-error test, we affirmed Scales's conviction, explaining that even if his "unrecorded statements had been suppressed the result would have been the same." *Id.* at 593. We explained that the evidence against Scales was very strong, even without his unrecorded statements. *Id.* After reviewing the evidence, we concluded that "any error in admitting the unrecorded statements was harmless." *Id.*

In *Scales v. State,* 620 N.W.2d 706, 708 (Minn.2001), we concluded that the *Knaffla* rule barred Scales's postconviction claim that the failure to record his custodial interrogation violated his right to due pro-

cess.[4] Citing *Scales,* 518 N.W.2d at 593, we explained that we "affirmed [Scales's] conviction on direct appeal because even if the due process right existed and the court suppressed [Scales's] unrecorded statement, the remaining evidence against [Scales] was strong and the result would have been the same." *Scales,* 620 N.W.2d at 708. Although we referenced *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (holding that a claimed constitutional error is harmless beyond a reasonable doubt where the verdict was surely unattributable to the error), we did not specify whether this reference was limited to the alleged due process right or whether it also applied to the erroneous admission of statements made during an unrecorded custodial interrogation. *See Scales,* 620 N.W.2d at 708.

■■ In this case, we need not, and do not, decide which harmless-error standard applies to a district court's erroneous admission of statements made during an unrecorded custodial interrogation because even under the more favorable constitutional harmless-error standard Sanders was not prejudiced by the district court's admission of Burke's testimony. When determining whether a jury verdict was surely unattributable to an erroneous admission of evidence, we consider the "manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *State v. Al–Naseer,* 690 N.W.2d 744, 748 (Minn.2005). We also consider the strength of the evidence of guilt. *State v. Hall,* 764 N.W.2d 837, 842 (Minn.2009).

In this case, the evidence introduced from the unrecorded interrogation was not inculpatory. The State did not present Burke's testimony to establish a critical element of the offense. *Cf. State v. Caulfield,* 722 N.W.2d 304, 314 (Minn.2006) (explaining that the erroneously admitted lab report impacted the verdict in part because the State presented the report as definitive evidence that the substance possessed by the defendant was cocaine); *State v. Litzau,* 650 N.W.2d 177, 184 (Minn.2002) (explaining that the erroneously admitted evidence impacted the jury's verdict in part because it went to the critical issue of whether the defendant possessed the drugs found in his car). Burke's testimony was not highly persuasive evidence of guilt because it in part reinforced Sanders's claim that he did not have sexual contact with B.J. by demonstrating that Sanders immediately and consistently denied the offense. Although the State discussed in the closing argument the denial by Sanders of the statements attributed to him by Burke, the State's discussion was brief. Defense counsel effectively countered the State's arguments regarding Burke's testimony by using Burke's own testimony to emphasize that Sanders immediately and consistently denied having sexual contact with B.J. In addition, the evidence of Sanders's guilt, including the DNA evidence recovered from the towel, was strong.

■ After considering all the relevant factors, we conclude that the jury's verdict was surely unattributable to the district court's admission of Burke's testimony regarding statements allegedly made by Sanders during an unrecorded out-of-state custodial interrogation conducted at a place of detention. Based on this conclusion, we affirm Sanders's conviction. We

---

4. In *State v. Knaffla,* 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976), we stated that "where direct appeal has once been taken, all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for postconviction relief."

need not, and do not, decide whether the *Scales* recording rule applies to a custodial interrogation conducted outside Minnesota or whether the alleged *Scales* violation in this case was substantial.[5]

Affirmed.

ANDERSON, PAUL H., Justice (concurring).

I agree with the result reached by the majority, but I concur because I do not agree with the approach used by the majority to reach this result. The majority appears to assume without deciding that the *Scales* rule applies to out-of-state custodial interrogations and then proceeds with a harmless-error analysis. I would decide this case based on harmless error; but unlike the majority, I would do so after first holding that *Scales* applies to this interrogation.

On appeal, Sanders has the burden of proving both that the district court abused its discretion in admitting the interrogation evidence collected by the FBI and that he was prejudiced by the admission of that evidence. *State v. Nunn,* 561 N.W.2d 902, 907 (Minn.1997) (citing *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994)). As the majority states, if the district court's decision to admit this evidence was harmless beyond a reasonable doubt, reversal is not warranted. *State v. Munson,* 594 N.W.2d 128, 143 (Minn.1999). "An error is harmless beyond a reasonable doubt only '[i]f the verdict actually ren-

dered was surely unattributable to the error.'" *Id.* (quoting *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996)). I conclude that it was error for the district court to admit evidence of the interrogation of Sanders given the FBI's failure to record the interrogation; but based on my review of the record, I conclude the jury's verdict as rendered was surely unattributable to the error. Here, the evidence introduced from the unrecorded interrogation was neither inculpatory nor prejudicial to Sanders.

Because I, unlike the majority, conclude that *Scales* applies to this interrogation, further discussion with respect to *Scales* is in order. The *Scales* opinion was issued by our court on June 30, 1994, one day before I joined the court. When we adopted the *Scales* rule in 1994, we were only the second state in the nation to adopt this approach. Our decision to adopt the *Scales* rule was greeted with considerable skepticism and dissent. Over the years, the wisdom of our decision has been proven and many law enforcement officials now heartily endorse recorded interrogations as an effective law enforcement tool.

*Scales* has significantly reduced the number of law enforcement issues confronting the courts. When I first joined our court, we were still dealing with many pre-*Scales* cases challenging *Miranda* warnings given by police officers. It was fairly routine for a defendant to question the propriety of an officer's *Miranda* warning. The use of *Scales* has revealed, in the vast majority of cases, the competence and general conscientiousness with which police officers in Minnesota advise

---

**5.** When an alleged evidentiary error is harmless, an appellate court need not address the merits of the claimed error. *See Hall,* 764 N.W.2d at 844 (explaining that the court need not decide whether the district court erred when it prevented the defense from inquiring about the manner in which Hall's statement was taken by the police because any such error was harmless). In addition, certain deficiencies in the record complicate a discussion of whether the alleged *Scales* violation in this case was substantial and whether the *Scales* recording rule applies to a custodial interrogation conducted outside Minnesota.

defendants of their rights under *Miranda.* As a result, in recent years, we have very few valid *Miranda* challenges that have come to our court. This is a good development.

Further, the use of *Scales* has in many cases eliminated frivolous and unfounded objections by defendants as to the circumstances surrounding their interrogation. While law enforcement initially feared that by having interrogations recorded it would lose an effective component of its interrogation of defendants, the opposite is true. Not only has *Scales* revealed that in almost all cases law enforcement does a conscientious job when conducting an interrogation, the recorded interrogation frequently turns out to be some of the best evidence against the defendant. In essence, *Scales* has resulted in the best of both worlds. The defendant's rights are protected and law enforcement is more effective.

I agree with the dissent that the rationale underlying *Scales* should and does apply with equal force to interrogations conducted both within and outside Minnesota. I do not understand the FBI's failure to use this proven procedure especially in light of the FBI's history in the middle of the 20th Century. During that time period, the FBI frequently took the lead nationally in advising defendants of their rights under the Constitution. Therefore, like the dissent, I would address the question of the *Scales* error head on and would conclude that *Scales* applies here. Nevertheless, because I conclude that any error was harmless, I would affirm Sanders's conviction.

PAGE, Justice (dissenting).

I respectfully dissent. In *State v. Scales,* 518 N.W.2d 587, 592 (Minn.1994), we held that "all custodial interrogation . . . shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention." We further held, under our "supervisory power to insure the fair administration of justice," that courts must suppress any statement "obtained in violation of the recording requirement if the violation is deemed 'substantial.'" *Id.* Our purpose in so holding "was to prevent factual disputes about the existence and context of *Miranda* warnings and any ensuing waiver of rights" by providing courts with an objective record of custodial interrogations. *See State v. Miller,* 573 N.W.2d 661, 674 (Minn.1998). We were concerned that courts tended to credit statements by law enforcement and, without more, conclude that the defendant waived his or her rights. *Scales,* 518 N.W.2d at 591 ("trial and appellant courts consistently credit the recollections of police officers regarding the events that take place in an unrecorded interview"). Even though law enforcement officers testified that the defendant in *Scales* waived his rights, we were persuaded that recording custodial interrogations was "a reasonable and necessary safeguard, essential to the adequate protection of the accused's right to counsel, his right against self incrimination and, ultimately, his right to a fair trial." *Id.* at 592 (quoting *Stephan v. State,* 711 P.2d 1156, 1159–60 (Alaska 1985)). Thus, the recording requirement is intended to provide an objective record of what takes place during custodial interviews and to eliminate the need for courts to decide factual disputes about a defendant's waiver of rights. *See State v. Robinson,* 427 N.W.2d 217, 224 n. 5 (Minn.1988).

When addressing alleged violations of the *Scales* recording requirement, we follow a two-step procedure. *State v. Inman,* 692 N.W.2d 76, 80 (Minn.2005). The first step is to determine whether *Scales* applies to the facts of the case. *Id.* If we

conclude that *Scales* is applicable, the second step requires us to determine whether the violation of the *Scales* recording requirement is substantial. *Id.* In this case, the court ignores both steps and, without determining whether there was a violation or whether, if there was a *Scales* violation, that violation was substantial, concludes that any violation was harmless beyond a reasonable doubt.

## I.

Sanders filed a pretrial motion to suppress, claiming that his statement to the FBI agents was unrecorded and that he "did not make a knowing, intelligent and voluntary waiver of his right against self incrimination," citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). At a pretrial hearing, Sanders' attorney highlighted the motion, arguing that, "[b]ecause it was not recorded, there is no way for me to independently determine whether or not it's correct *as alleged* that Mr. Sanders was advised of his Miranda Warnings and that the statement given was a knowing and voluntary statement." (Emphasis added.)

The district court ruled that there was no *Scales* violation because the *Scales* rule "applies specifically to the Minnesota Supreme Court's authority to exercise its supervisory power ... [that] does not extend, and would be unfair to be extended, to FBI agents or other law enforcement officials who are not aware of its terms." The district court did not analyze whether

the FBI's failure to record was a substantial violation of the *Scales* recording requirement. The court of appeals affirmed, holding that *Scales* was intended to govern conduct occurring within Minnesota. *State v. Sanders*, 743 N.W.2d 616, 620 (Minn.App.2008). Like the district court, the court of appeals did not reach the question of whether the failure to record Sanders' statement was a substantial violation of *Scales*. In this appeal, the court declines to address the applicability of *Scales*, holding that the jury's verdict was surely unattributable to the admission of the FBI agent's testimony. My reading of *Scales* and its progeny leads me to conclude that the district court and the court of appeals' holdings are wrong and that we should squarely address the issue.[1] My reading of the record before us leads me to conclude that it cannot be said with any certainty that the verdict was surely unattributable to the error in admitting the unrecorded testimony of the FBI agent.

The *Scales* recording requirement is a necessary safeguard, essential to the protection of a defendant's right to counsel, right against self-incrimination, and right to a fair trial. *Scales*, 518 N.W.2d at 592. Because we have never limited our concern for a defendant's rights solely to cases involving Minnesota law enforcement or events occurring solely within Minnesota's geographical borders,[2] I conclude that the rationale underlying the *Scales* decision applies with equal force to interrogations

---

1. With respect to the district court's ruling, I would note that this court has no supervisory power over law enforcement officials in the executive branch of Minnesota state government. As for the court of appeals' determination, I would note that the concerns that prompted our *Scales* decision are not mitigated by the fact that an interrogation takes place outside of Minnesota's borders. If anything, that fact aggravates those concerns.

2. We often consider events that occur outside of Minnesota and analyze those events under Minnesota law to see if they comport with our own standards. *See, e.g., State v. Reece*, 625 N.W.2d 822, 825–26 (Minn.2001) (specifying that the criminal history score of out-of-state offenses must be analyzed under Minnesota sentencing guidelines); *State v. Lucas*, 372 N.W.2d 731, 736–37 (Minn.1985) (applying Minnesota evidentiary rules to admit evidence

conducted both within and outside of Minnesota. On that basis, I conclude that *Scales* applies to Sanders' interrogation. Having concluded that the *Scales* requirement applies, I would go on to determine whether that requirement was violated in this case and, if so, whether the violation was substantial.

In *Inman*, we indicated that "[t]he *Scales* requirement mandates that all custodial interviews at a place of detention be recorded" and that, "[i]f such an interview is not recorded, by definition it violates the *Scales* requirement." 692 N.W.2d at 80. Sanders was arrested by FBI agents and was taken to a place of detention and interrogated. The interview was not recorded. By definition, therefore, the *Scales* requirement was violated. *See Inman*, 692 N.W.2d at 80. Whether that violation requires suppression of Sanders' FBI interrogation turns on whether the failure to record the interrogation was a substantial violation of the *Scales* rule.

### II.

When determining whether a *Scales* violation is substantial and whether the unrecorded statement must be suppressed, we follow "the approach recommended by the drafters of the Model Code of Pre–Arraignment Procedure." *Scales*, 518 N.W.2d at 592. In particular, we are to consider "all relevant circumstances bearing on substantiality, including those set forth in section 150.3(2) and (3) of the Model Code of Pre–Arraignment Procedure." *Scales*, 518 N.W.2d at 592. Under section 150.3(5) of the Model Code, "the prosecution shall have the burden of showing by the preponderance of the evidence that such statement ... should not be excluded" because the violation was not substantial. *Model Code of Pre–Arraignment Procedure* § 150.3(5) (Proposed Official Draft 1975).

Under section 150.3(2)(a) of the Model Code, a violation is substantial if "[t]he violation was gross, wilful and prejudicial to the accused. A violation shall be deemed wilful regardless of the good faith of the individual officer if it appears to be part of the practice of the law enforcement agency or was authorized by a high authority within it." Section 150.3(3)(g) requires consideration of "the extent to which the violation prejudiced the defendant's ability to ... defend himself in the proceeding in which the statement is sought to be offered in evidence against him." *Model Code*, § 150.3(3)(g).

The question, then, is whether the State met its burden in this case of showing that there was no substantial violation of the *Scales* requirement. It did not. It is a practice of the FBI not to record custodial interrogations and, in accordance with that practice, the FBI agent here did not record Sanders' statement. This failure to record Sanders' custodial interrogation is therefore "deemed wilful regardless of the good faith of the individual officer." *See Model Code*, § 150.3(2)(a).

The admission of the agent's statement was also prejudicial. In this case, Sanders was not able to defend against the challenge to his credibility resulting from the State's use of his alleged statements made during the unrecorded interrogation. This credibility battle between an officer and a defendant is precisely the situation we sought to avoid in *Scales*.

Here, the State, in its effort to show that the violation was neither substantial nor prejudicial, offered testimony from the FBI agent that Sanders was advised of his rights against self-incrimination, waived those rights, and agreed to be interviewed. This testimony does not address, much less meet, the State's burden. It, instead,

obtained in Wisconsin that would have been    inadmissible in Wisconsin).

attempts to show that a *Miranda* warning was given and that Sanders waived his right to remain silent. If a law enforcement officer's testimony about a defendant's waiver is enough to meet the State's burden of showing that a *Scales* violation is not substantial, then the *Scales* requirement is meaningless. The note to Model Code § 150.3 explains that placing upon the State the burden of showing a violation is not substantial "alleviate[s] the dilemma of a court which is confronted with conflicting versions of what took place during the custody of an arrested person." The note further states that if a court finds an "agency has not taken reasonably adequate steps in good faith to assure compliance . . ., it should give special credence to the account of the defendant." *Model Code*, § 150.3 note. In this case, the *Scales* requirement was violated because there was no recording. Nothing in this record suggests that the State took any steps, much less reasonably adequate steps, in good faith to assure compliance with the *Scales* recording requirement. Indeed, the record is silent on the actions taken by the State. On that basis, I can only conclude that the unrecorded interrogation constituted a substantial *Scales* violation warranting suppression of any statements from that interrogation. Therefore, I would end the analysis here, concluding that the district court erred in admitting the FBI agent's testimony, and grant Sanders a new trial. However, because the court applies a harmless-error analysis and concludes that any error was harmless beyond a reasonable doubt, I will address that issue as well.

### III.

We generally review evidentiary errors applying a harmless error impact analysis to determine if the error was sufficiently harmful to warrant a new trial. In *Scales*, we upheld Scales' conviction despite the admission of the unrecorded interrogation because "the result would have been the same." 518 N.W.2d at 593. That is to say, "any error in admitting the unrecorded statements was harmless." *Id.* Notwithstanding the fact that we appeared to apply a harmless-error analysis in *Scales*, it is unclear which harmless-error analysis should be applied to a *Scales* violation, if one should be applied at all. Because we have yet to determine whether a *Scales* violation implicates a constitutional right, we have not decided whether to apply the constitutional standard for reviewing harmless error, i.e., whether the verdict was surely unattributable to the error, *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997), or the standard we apply to non-constitutional error, i.e., whether the error substantially influenced the jury's verdict, *State v. Anderson*, 763 N.W.2d 9, 12 (Minn.2009). The court notes that it need not decide which standard applies "because even under the more favorable constitutional harmless-error standard, Sanders was not prejudiced by the district court's admission of [the FBI agent's] testimony." I disagree.

Under the constitutional harmless-error standard, the error was not harmless beyond a reasonable doubt. To show an error is harmless beyond a reasonable doubt, the State must prove that the jury's verdict was surely unattributable to the error. *Juarez*, 572 N.W.2d at 292. We do not determine "whether a jury would have convicted the defendant without the error, rather we look[ ] to whether the error reasonably could have impacted upon the jury's decision." *Id.* When determining whether the jury's verdict was surely unattributable to an error, we consider the manner in which the evidence was presented, the persuasiveness of the evidence, the use of the evidence in closing, whether evidence was effectively countered by the defense, and the strength of the evidence of guilt. *State v. Al-Naseer*, 690 N.W.2d 744, 748 (Minn.2005).

The manner in which the evidence was presented is significant when it gives the evidence special weight, such that it is perceived to be more persuasive. *See State v. Ferguson,* 581 N.W.2d 824, 833 (Minn.1998) (reviewing an erroneously admitted dying declaration for persuasiveness by analyzing the manner in which it was presented). That is what occurred here. Generally, in cases involving competing recollections of the same event, the jury must determine the credibility of each witness. As noted above, when a law enforcement officer testifies to certain events, such as an unrecorded interrogation, the tendency is to credit the officer's testimony to the detriment of the defendant. *See Scales,* 518 N.W.2d at 591. Here, the FBI agent testified to Sanders' statements made during the unrecorded interrogation. Because this evidence was admitted through the FBI agent's testimony, the jury likely gave it special weight, thereby increasing the persuasiveness and finding it more credible than Sanders' testimony. Further, if the jury found Sanders to be less credible due to the special weight afforded to the FBI agent's testimony, that conclusion would influence the jury's credibility determinations with respect to other witnesses. Although the agent's testimony did not suggest that Sanders made any inculpatory statements, the State used the agent's testimony to effectively attack Sanders' credibility. Specifically, the State used that testimony to impeach Sanders during cross-examination and closing. Sanders had testified that the allegations by B.J. were untrue. He detailed his actions on the day in question, explaining that he did not have any contact with B.J., and further denied any of the other sexual conduct alleged by B.J. and her sister, N.J. On cross-examination, the State questioned Sanders extensively about statements he made during the unrecorded interrogation. In doing so, the

State repeatedly confronted Sanders with the agent's testimony that Sanders gave him a false birth date and admitted that he had lied to them about his birth date. The State also confronted Sanders with the agent's allegations that Sanders made several other statements, including saying "I did not f - - - her," that B.J. had a venereal disease, and that Sanders had slept with an upstairs neighbor who also had a venereal disease. When Sanders denied making these statements, the State impeached him by referencing the agent's testimony. In total, eight pages of the State's 19-page cross-examination of Sanders focused on the contradictions between Sanders' testimony and that of the FBI agent.

The State further exploited the inconsistencies between the FBI agent and Sanders during closing. Although the court notes that "fewer than four pages of the state's closing argument were spent discussing Sanders's denial of the statements attributed to him by [the agent]," it does not necessarily follow that the admission of that testimony was therefore harmless. Four pages focusing heavily on the contradictions between the agent's and Sanders' testimony out of a 25-page closing argument is significant. Further, in the remaining pages of the closing, the State concentrated on credibility. Because B.J.'s testimony provided the most inculpatory evidence, the State first focused on bolstering her credibility. The State then focused on Sanders' lack of credibility by aggressively comparing his testimony to that given by each of the other witnesses. In order to remove any doubt that B.J. would have been lying, the State referenced the FBI agent's testimony, arguing that it would not have made sense for B.J. to be lying as part of a conspiracy to convict Sanders unless the FBI agent was in on the conspiracy and was also lying. The State also attacked Sanders' credibility in other ways—such as by pointing out the lack of detail in Sanders' recollection of

the events on the day of the alleged incident.

According to the court, Sanders was able to counter the testimony of the FBI agent by arguing in his closing that he "consistently said in Chicago, when he was interviewed by the FBI and on this witness stand, [the alleged contact] didn't happen." This statement from Sanders' closing argument did not effectively counter the harm the agent's testimony did to Sanders' credibility for at least two reasons. First, a closing is not testimony. Because the interrogation was unrecorded, there was no effective way for Sanders to offer evidence to counter the erroneously admitted testimony. Second, it is likely that, if the jury believed that Sanders lacked credibility, it also believed that Sanders' denial at trial and defense counsel's statement during closing was also not credible.

In the end, the jury's verdict in this case turned on whether the jury credited B.J.'s testimony or Sanders' testimony. Because the State was able to use the FBI agent's testimony regarding Sanders' unrecorded interrogation to aggressively undermine Sanders' credibility, it cannot be said that the jury's verdict was surely unattributable to the error in admitting that testimony.

Because this is a close case that turned on Sanders' credibility, I also conclude that under the less stringent non-constitutional harmless-error standard, it cannot be said that the error did not substantially influence the jury's verdict. Therefore, I would reverse Sanders' conviction and remand for a new trial.

MEYER, Justice (dissenting).

I join in the dissent of Justice Page.