STATE OF MINNESOTA

IN SUPREME COURT

A13-1241

Wright County                                                                    Anderson, J.

State of Minnesota,

        Respondent,

vs.                                                                         Filed:  August 6, 2014
                                                                      Office of Appellate Courts

Keith Richard Rossberg,

        Appellant.

_____

Lori Swanson, Attorney General, Karen B. Andrews, Assistant Attorney General, Saint Paul, Minnesota; and

Thomas N. Kelly, Wright County Attorney, Buffalo, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Rochelle R. Winn, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court erred by admitting *Spreigl* evidence without identifying a precise disputed fact to which it was relevant, but the error was harmless.

2.      The passage of time did not render evidence of the appellant's relationship with the victim irrelevant.

1

3.      The appellant failed to show that any error in admitting hearsay evidence of the victim's statements to the police affected his substantial rights.

4.      The appellant's pro se claims do not entitle him to relief.

Affirmed.

O P I N I O N

ANDERSON, Justice.

This is appellant Keith Rossberg's direct appeal from his conviction for first-degree premeditated murder, *see* Minn. Stat. § 609.185(a)(1) (2012), for killing Devan Hawkinson.  Rossberg claims that he is entitled to a new trial because the district court admitted evidence of his past conduct and relationship with Hawkinson.  Rossberg argues that the evidence was irrelevant and that it violated the Confrontation Clause because it included testimonial statements that Hawkinson made to the police before his death.  Rossberg also raises a variety of other claims in his pro se briefs.  Because any error in admitting the evidence was harmless and none of Rossberg's pro se claims merit relief, we affirm.

I.

Before Hawkinson was murdered, he and Rossberg were friends for many years.  They lived close to each other in Annandale and Rossberg spent much of his time at Hawkinson's trailer home.  In early 2006 Hawkinson introduced Rossberg to D.T., who had grown up nearby and recently moved back to the area.  Rossberg and D.T. began a romantic relationship and D.T. moved in with Rossberg.

2

D.T. moved out in 2008 and began renting a room in Hawkinson's trailer, though she remained romantically involved with Rossberg. Hawkinson's friends and neighbors believed that D.T. was engaged in a "love triangle" with Rossberg and Hawkinson. In any case, the relationship between D.T. and Hawkinson upset Rossberg.

In September 2008, D.T. called the police to report that Rossberg might be suicidal. When the police responded, Rossberg was not suicidal but said that he was angry because he had caught D.T. cheating on him with Hawkinson. Later that night, the police received a 911 call from Hawkinson's phone. An officer went to Hawkinson's trailer and D.T. told him that Rossberg had been pounding on the door while she and Hawkinson were inside. The officer found Rossberg and sent him home. According to a neighbor this was not an isolated incident; Rossberg frequently came to Hawkinson's trailer and banged on the doors and windows if D.T. and Hawkinson did not let him in.

Rossberg was often angry about the situation with D.T. and Hawkinson. He told his son that he would "beat the shit out of" Hawkinson or "fuck him up" if he got too close to D.T. In October, while drinking with a friend, he asked for help beating up Hawkinson and asked to borrow the friend's machete to kill Hawkinson. The friend dismissed this as "drunk talk," but a police officer heard about the threats and checked in on Hawkinson a few days later. Hawkinson said he was afraid that Rossberg might hurt him, possibly with one of his many guns.

While D.T. was living with Hawkinson, Hawkinson's friends and neighbors saw him with black eyes on several occasions. Once, Hawkinson said that Rossberg had "smacked" him after looking in a window and seeing him being "aggressive" with D.T.

3

Another time, Hawkinson acted embarrassed and said he had gotten a black eye falling down. Rossberg said he had "bop[ped]" Hawkinson because of how he treated D.T.

Late one night in November 2008, Hawkinson called the police and reported that Rossberg was pounding on his door. Rossberg left before the police arrived, but Hawkinson and D.T. said they did not want him to come back that night, so the police found Rossberg at home and told him to stay away. The next evening, Hawkinson called the police again because Rossberg was back and was yelling at him and D.T. Hawkinson was particularly concerned this time because Rossberg had entered the trailer even though Hawkinson thought the door was locked. According to D.T. and one of Hawkinson's friends, Rossberg knew where Hawkinson hid a spare key to his trailer. Hawkinson again said that he wanted the police to make sure that Rossberg did not come back. The police found Rossberg in his trailer and told him to stay away from Hawkinson for the night.

About a month later, in mid-December 2008, D.T. again called the police to say that Rossberg might be suicidal, this time because she thought she had heard a gunshot from inside his trailer. After getting Rossberg's permission to search his trailer, the police found a loaded .22-caliber pistol under a pillow on the couch. The officer who found the gun was unable to tell if it had been fired recently. The officer talked to Rossberg, determined that he was not suicidal, and took no further action.

D.T.'s former husband began visiting her in August 2009. Once, while the former husband was with D.T. and Hawkinson in Hawkinson's trailer, Rossberg began pounding on the door and yelling at them. Hawkinson warned the former husband not to go outside

4

and to watch out for Rossberg because he owned guns. The next spring, D.T. moved away to live with her former husband. Rossberg remained upset at Hawkinson. That fall, he told a friend that he wanted to shoot Hawkinson with his .22.

On March 20, 2011, D.T. called Hawkinson to tell him that things were not working out with her former husband and to ask about renting the room in his trailer again. Hawkinson was happy and excited that D.T. was coming back and shared the news with his friends. Rossberg, by contrast, was sad and complained to his cousin that the situation with D.T. made him dislike Hawkinson.

On March 25, Rossberg called the police and reported that someone had broken into his trailer and stolen his loaded .22-caliber pistol. He said that he had dead-bolted his door, walked to town, and returned to find the door open. The officer saw pry marks on the door and doorframe but thought that the damage looked too minor for a dead-bolted door that had been forced open. Rossberg asked whether he would be liable if anyone was hurt or robbed with his gun, which the officer found unusual. The officer also found it unusual that Rossberg was able to recite the missing gun's serial number from memory despite not having any documentation for it. After speaking to the police, Rossberg went to see his cousin. He acted nervous and repeatedly mentioned that his gun had been stolen. He also brought up D.T. and Hawkinson, called them names, and got angrier as he talked about them. He said he was tired of the situation and was planning to move away.

Later the same evening, the daughter of one of Hawkinson's neighbors stepped outside her parents' house to make a phone call and saw Rossberg arguing with

5

Hawkinson in front of Hawkinson's trailer. Someone in another neighbor's house heard loud, confrontational yelling coming from Hawkinson's trailer. The next morning, Hawkinson's neighbors saw Rossberg walk to Hawkinson's trailer twice. The second time, Rossberg stood in Hawkinson's driveway, looked toward the trailer for a few minutes, and then walked away. The morning after that, March 27, Hawkinson's neighbor again saw Rossberg twice walk toward Hawkinson's trailer, stop, look at it, and then walk away.

That afternoon, one of Hawkinson's friends went to Hawkinson's trailer to have coffee and watch television, as was his routine. He found the door locked and ringed in soot and heard a smoke or fire alarm going off inside. When emergency responders arrived, they found Hawkinson dead and partially burned, sitting in a chair in the living room. The burners on the stove were open, releasing gas into the trailer. The fire marshal determined that the fire that burned Hawkinson's body had started in newspapers piled at his feet and had gone out before the gas was turned on, because otherwise the gas would have ignited. The fire marshal also found an extinguished candle on the countertop near the stove and concluded that if it had been lit when the burners were opened, it must have gone out before enough gas built up to ignite.

The medical examiner found six small entrance wounds in the back of Hawkinson's head and several bullet fragments inside. She concluded that Hawkinson was killed by the gunshots before being burned. The wounds and bullet fragments were consistent with a .22-caliber gun, and the police found six spent .22-caliber shell casings

6

around Hawkinson's body. Those casings were fired from the same gun as spent casings that the police later found in Rossberg's trailer.

The police found two handwritten notes in Hawkinson's trailer. They read, "I'll Get you! ByE!" and "Your Dead! Bye!" A bear-like face was drawn on each note and Rossberg's son said that Rossberg drew similar faces on notes to him. A forensic document examiner concluded that Rossberg "probably" wrote the notes.

Several months later, Rossberg was in custody at the Wright County jail. Another inmate found an envelope addressed "To the Courts" tucked inside a magazine among the generally accessible reading materials. The envelope contained a handwritten letter purporting to be from an assassin hired to kill both Hawkinson and Rossberg. The assassin claimed to have killed Hawkinson and asked for Rossberg to be released so that the assassin could finish the job by killing him. The document examiner could only perform a limited analysis of the letter because the handwriting seemed "careless" or unnatural, but she found "indications" that Rossberg "may have" written it.

A grand jury indicted Rossberg for first-degree premeditated murder and second-degree intentional murder. Before his jury trial, Rossberg moved to preclude the State from offering evidence of his past bad conduct toward Hawkinson because it was irrelevant. The district court held a hearing, carefully analyzed the proffered evidence, excluded some incidents and details, and admitted others. Throughout the trial, the court repeatedly instructed the jury about the limited purposes for which it was to use the evidence of past conduct. The jury found Rossberg guilty of both counts, and the court

convicted him of first-degree premeditated murder under Minn. Stat. § 609.185(a)(1) and sentenced him to life in prison without the possibility of release.

## II.

Rossberg argues that the district court erred by admitting much of the evidence about his past bad conduct. To prevail, Rossberg must show that the district court abused its discretion by admitting the evidence and that the erroneous admission was prejudicial. *See, e.g.*, *State v. Sanders*, 775 N.W.2d 883, 887 (Minn. 2009). Because Rossberg does not assert that admission of this evidence violated his constitutional rights, we consider any error harmless unless it substantially influenced the jury's verdict. *Id.*

The evidence that Rossberg challenges is "[e]vidence of another crime, wrong, or act," Minn. R. Evid. 404(b), which is also known as "*Spreigl* evidence," after *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). This kind of evidence may not be used to prove that a person acted a certain way because he or she had a certain character. Minn. R. Evid. 404(b). It may, however, be admissible to prove other things, like whether a person had a motive or opportunity to act a certain way, or planned or prepared to do something. *Id.* Even then, its admission is subject to certain conditions. *Id.*

Within this class of evidence of other bad acts, we have distinguished traditional "collateral" *Spreigl* evidence, which concerns "an unrelated crime against another person," not the present victim, from "evidence that illuminates the history of the relationship *between an accused and a victim*." *State v. McCoy*, 682 N.W.2d 153, 159, 161 (Minn. 2004) (emphasis added) (internal quotation marks omitted). The district court expressly admitted some evidence as "*Spreigl* evidence"—meaning the first type—and

8

some as "relationship evidence"—meaning the second—and Rossberg makes different challenges to each. Accordingly, we address Rossberg's arguments separately.

A.

The evidence that the district court admitted as collateral *Spreigl* evidence was testimony about the 911 call from December 2008, in which D.T. reported thinking that Rossberg might be suicidal because she had heard a gunshot in his trailer. One of the requirements for admitting *Spreigl* evidence is that the district court "must identify the precise disputed fact to which the *Spreigl* evidence would be relevant." *Angus v. State*, 695 N.W.2d 109, 120 (Minn. 2005). In this case, the district court explained that testimony about the 911 call was relevant to "whether or not Mr. Rossberg committed this crime, and was in possession of the weapon used in the commission of this crime." Rossberg argues that the district court's explanation failed to identify a "precise disputed fact." We agree.

The first part of the district court's statement—"whether or not Mr. Rossberg committed this crime"—simply states the ultimate issue of guilt; it does not identify a "precise disputed fact." The second part—"whether or not Mr. Rossberg . . . was in possession of the weapon used in the commission of this crime"—does identify a specific fact, but not one that was in dispute. Rossberg did not deny that he reported that his gun was stolen a few days before Hawkinson's murder, necessarily implying that he had previously possessed it. The State suggests that the testimony about the 911 call was relevant to the alleged fact that Rossberg "discharg[ed] the weapon in response to a confrontation with [D.T.]." But we review "whether the . . . rationale *cited by the district*

9

*court* provides a proper basis upon which to admit the . . . evidence," *State v. Fardan*, 773 N.W.2d 303, 317 (Minn. 2009) (emphasis added), and the district court referred only to whether Rossberg "was in possession of the weapon" and said nothing about discharging the gun. Moreover, the State presented no evidence that Rossberg confronted D.T. around the time of Hawkinson's murder, so it is unclear why the alleged fact that Rossberg once fired the gun after confronting D.T. would be relevant to whether he shot Hawkinson with the gun. In short, because the "precise disputed fact[s]" identified by the court were either not precise or not disputed, they did not support admission of *Spreigl* evidence about the 911 call.

Even so, the district court's error does not entitle Rossberg to a new trial, because there is no "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Ness*, 707 N.W.2d 676, 691 (Minn. 2006). At the outset, we note that the court minimized the risk of prejudice by carefully and repeatedly instructing the jury not to find Rossberg guilty based on his past conduct. *Cf. Fardan*, 773 N.W.2d at 320 (explaining that generally "[t]he jury is presumed to have followed such instructions"). And to the extent the incident suggested anything about Rossberg having a violent character, the violence was toward himself, not Hawkinson. In addition, the testimony about the 911 call was not central to the State's case. The State mentioned the incident only as a single minor piece of the puzzle that was the ongoing relationship between Rossberg, D.T., and Hawkinson.

More critically, the other evidence of Hawkinson's guilt was overwhelming: Rossberg made a specific threat to shoot Hawkinson with his .22-caliber pistol; the gun

10

disappeared just days before it was used to kill Hawkinson; Rossberg acted suspiciously when reporting the gun stolen; Rossberg repeatedly told his cousin that the gun had been stolen while ranting about Hawkinson and D.T.; Rossberg probably wrote threatening notes and left them in Hawkinson's trailer; witnesses saw Rossberg arguing with Hawkinson shortly before Hawkinson was killed; witnesses saw Rossberg approach Hawkinson's trailer around the time Hawkinson was killed; witnesses saw Rossberg repeatedly walk out to look at Hawkinson's trailer from a distance while the fire was likely burning inside and the gas was turned on; the bullet fragments from Hawkinson's wounds were consistent with Rossberg's gun; the shell casings from the scene of the murder matched shell casings found in Rossberg's trailer; and Rossberg might have written the letter purporting to be from the assassin in an attempt to exculpate himself and get out of jail. In short, given the other evidence that Rossberg killed Hawkinson, there is no reasonable possibility that hearing that Rossberg may have shot his gun in his trailer in 2008 significantly influenced the jury's decision to find him guilty of the murder of Hawkinson more than 2 years later.

B.

The district court admitted testimony about the following incidents as evidence of Rossberg's relationship with Hawkinson: the two 911 calls from September 2008, in which D.T. reported that Rossberg might be suicidal and that he was yelling and pounding on Hawkinson's door; Rossberg telling his son that he would hurt Hawkinson if Hawkinson got too close to D.T.; Rossberg's statements to his friend about wanting to kill Hawkinson with a machete; Hawkinson's neighbor seeing Rossberg repeatedly

11

pounding on Hawkinson's doors and windows; one of Hawkinson's black eyes and Rossberg's admission that he caused it; the two 911 calls from November 2008 about Rossberg yelling, pounding on Hawkinson's door, and entering Hawkinson's trailer; and Rossberg's statement in fall 2010 about wanting to shoot Hawkinson with his .22. Rossberg does not challenge the admission of his 2010 statement about wanting to shoot Hawkinson, but argues that the rest of the testimony was irrelevant and therefore inadmissible, largely because it focused on events more than 2 years before Hawkinson's murder.

We use a fact-dependent "balancing process as to time, place, and modus operandi," rather than a strict cut-off, to determine when conduct that occurred before a charged offense is no longer relevant. *State v. Washington*, 693 N.W.2d 195, 202 (Minn. 2005). Among the factors that we consider is whether "intervening acts tend to bolster the prior act's relevance and materiality." *Id.* In this case, Rossberg's acts in 2009 and 2010, in light of the events of those years, make the challenged evidence relevant. In particular, the evidence from 2008 established the relationship between Rossberg, Hawkinson, and D.T., which persisted until Hawkinson's murder. Rossberg continued to spend much of his time with D.T. at Hawkinson's trailer until D.T.'s former husband arrived in the summer of 2009. At that point, Rossberg followed the same pattern of confrontational behavior that began in 2008 and simply expanded his focus to include the former husband as well as Hawkinson. Even after D.T. moved away in 2010, Rossberg's relationship with Hawkinson remained strained and Rossberg again said he wanted to kill Hawkinson. Accordingly, Rossberg's conduct in 2008 was relevant because it provided

12

necessary background and context to the development of the ongoing conflict between Rossberg and Hawkinson that is central to understanding this case.[1] Thus, the district court did not abuse its discretion by admitting the testimony.

III.

In addition to the other *Spreigl* and relationship evidence, the district court admitted testimony by D.T. and two police officers about two statements that Hawkinson made to the police in the fall of 2008. The first statement was from October, when an officer checked on Hawkinson's welfare after learning that Rossberg had said he wanted to kill Hawkinson with a knife. Hawkinson reportedly said that he knew that Rossberg owned guns and was afraid that Rossberg would shoot him. The second statement was from November, when Hawkinson called the police to report that Rossberg was in his trailer yelling at him and D.T. Hawkinson reportedly told the officer that he was afraid of Rossberg, that Rossberg had entered the trailer even though the door was locked, and that he did not want Rossberg to come back. Rossberg argues that the hearsay testimony about Hawkinson's statements was inadmissible because it violated his rights under the Confrontation Clause and because it was irrelevant. We address each argument in turn.

---

[1] Rossberg also suggests that some portions of the testimony—he does not specifically identify which—were irrelevant because they did not actually concern his relationship with Hawkinson. We acknowledge that the connection between the relationship and, in particular, the testimony about D.T. reporting that Rossberg might be suicidal is thin. But in light of the other overwhelming evidence of Rossberg's guilt, the error, if any, in admitting that testimony was harmless.

13

## A.

In general, we will not consider a challenge to the admission of evidence "unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Minn. R. Evid. 103(a)(1). Rossberg did not object specifically under the Confrontation Clause or specifically mention the Confrontation Clause in his brief to the district court, at the pretrial hearing on the State's proffered evidence, or at trial. And it was not "apparent from the context" that the Confrontation Clause was the "specific ground" for Rossberg's challenge. *Id.* Rossberg challenged "the State's introduction of any statements by Devan [Hawkinson] . . . *under Rule 807*" (emphasis added), and his only argument against admission of testimony about Hawkinson's statements focused on Minn. R. Evid. 807, the residual hearsay exception. Given Rossberg's exclusive focus on Rule 807, it is certainly plausible to read his challenge as based only on that Rule, so a Confrontation Clause challenge was not apparent from the context of the objection. *See State v. Brown*, 792 N.W.2d 815, 820 (Minn. 2011) (determining whether a claimed ground for an objection was apparent by considering whether there were other plausible grounds for the objection in context).

Even though Rossberg failed to object specifically and preserve his challenge under the Confrontation Clause, we can still "tak[e] notice . . . of plain errors affecting substantial rights." Minn. R. Evid. 103(d); *see also, e.g.*, *State v. Williams*, 525 N.W.2d 538, 544 (Minn. 1994); *cf.* Minn. R. Crim. P. 31.02. Under the plain-error standard, relief is available only if there is "(1) error, (2) that was plain, and (3) that affected the

defendant's substantial rights." *Brown*, 792 N.W.2d at 820. If those conditions are met, we "assess[] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998).

In this case, we need not and do not consider whether the district court committed error or whether any error was plain, because Rossberg has not shown that any violation of the Confrontation Clause affected his substantial rights and thus he cannot obtain relief under the plain-error standard. *See* Minn. R. Evid. 103(d); *State v. Goelz*, 743 N.W.2d 249, 258 (Minn. 2007) ("If a defendant fails to establish that the claimed error affected his substantial rights, we need not consider the other factors."). An error affects substantial rights if there is a "reasonable likelihood" that it "substantially affected the verdict." *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002). This "heavy burden" is not met here. *See State v. Tscheu*, 758 N.W.2d 849, 864 (Minn. 2008) (quoting *Griller*, 583 N.W.2d at 741).

The aspect of the challenged testimony that is most likely to have affected the verdict is Hawkinson's reported statement that Rossberg entered his locked trailer. That fact was significant because it could support an inference that Rossberg had access to a key to Hawkinson's trailer, which would explain how Rossberg could have entered Hawkinson's trailer to kill him even though Hawkinson's door was locked when his body was found. But such an inference was not necessary, because the State presented stronger evidence on that same point, in the form of undisputed testimony from D.T. and one of Hawkinson's friends that Rossberg knew where Hawkinson hid a spare key. In light of that testimony, as well as the other overwhelming evidence of Rossberg's guilt, it

15

is not reasonably likely that the indirect, cumulative evidence in Hawkinson's statements to the police substantially affected the jury's verdict.

## B.

Rossberg also argues that the testimony about Hawkinson telling the police that he was afraid of Rossberg was irrelevant. Unlike Rossberg's challenge under the Confrontation Clause, this claim was fairly encompassed within Rossberg's objection to admission of the testimony "under Rule 807," because Minn. R. Evid. 807 requires evidence to relate to a "material fact." Accordingly, we review it under the harmless-error standard. *See Sanders*, 775 N.W.2d at 887.

A victim's fear of a defendant can be relevant to the defendant's guilt if the defendant raises a defense that turns on the victim's behavior. *See State v. Blanchard*, 315 N.W.2d 427, 432 (Minn. 1982). For example, if the defendant claims to have acted in self-defense, the fact that the victim was afraid of the defendant might bear on whether the defendant's account is believable. *Id.* In the absence of such a defense, however, "[o]rdinarily, a homicide victim's state of mind is not relevant to whether the defendant committed the crime." *State v. DeRosier*, 695 N.W.2d 97, 105 (Minn. 2005). Here, Rossberg did not raise any defense that had anything to do with Hawkinson's behavior or state of mind. Therefore, the evidence that Hawkinson was afraid of Rossberg was irrelevant.

The district court's error in admitting the testimony does not require reversal, however, because it was harmless. Not only was the other evidence of Rossberg's guilt overwhelming, but the testimony about Hawkinson being afraid of Rossberg added little

16

to the undisputed testimony that Rossberg had struck, verbally harassed, and threatened to kill Hawkinson and that Hawkinson had repeatedly sought police assistance to keep Rossberg away from him. There is no reasonable probability that the additional evidence that Hawkinson was afraid of Rossberg significantly affected the verdict. *See Ness*, 707 N.W.2d at 691; *see also, e.g.*, *Blanchard*, 315 N.W.2d at 433 (holding a similar error harmless when "[t]he state of mind evidence was merely cumulative" and "there was overwhelming evidence of defendant's guilt").

## IV.

Finally, Rossberg challenges his conviction on several grounds in his pro se briefs.[2] Some of Rossberg's challenges are based on the evidence of his past conduct and the alleged Confrontation Clause violation. Because Rossberg's pro se briefs do not add anything to his attorney's arguments on those issues, we reject his challenges in light of our analysis above. The rest of Rossberg's challenges consist of factual assertions with no support in the record and conclusory declarations detached from any legal reasoning.

---

[2] In particular, we can identify the following claims in Rossberg's pro se briefs: the district court judge should have recused herself; the district court judge allowed the prosecutor to commit misconduct; the prosecutor interviewed witnesses before the trial without police present; the prosecutor inflamed the jury's passions or biases; the prosecutor revealed his personal feelings about Rossberg's guilt; the State relied on evidence that was obtained illegally; the testimony about Hawkinson's statements to the police violated the Confrontation Clause; the State used evidence of Rossberg's past conduct to attack his character and show a propensity to commit crimes; the district court failed to instruct the jury on how to properly consider the evidence of Rossberg's past conduct; Rossberg's sentence was based on false or unreliable information about his past conduct; the district court should have sentenced Rossberg for second-degree murder rather than first-degree murder because it is less serious; Rossberg should have been given a meaningful opportunity to present a complete defense; and the errors at Rossberg's trial, taken cumulatively, were not harmless.

Rossberg also makes several legal pronouncements with no explanation of how they relate to his case. We treat such unsupported claims as waived and do not consider them "unless prejudicial error is obvious on mere inspection." *Kaehler v. Kaehler*, 219 Minn. 536, 537, 18 N.W.2d 312, 313 (1945); *accord, e.g.*, *State v. Krosch*, 642 N.W.2d 713, 719 (Minn. 2002). Because the only errors that we can discern in Rossberg's trial were harmless, Rossberg's pro se challenges do not entitle him to relief.

V.

For the forgoing reasons, we affirm Rossberg's conviction.

Affirmed.