STATE of Minnesota, Respondent,

v.

Joseph Haywood CAMPBELL,
Appellant.

No. A13–1713.

Supreme Court of Minnesota.

March 18, 2015.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, Saint Paul, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

## OPINION

PAGE, Justice.

A Ramsey County jury found appellant Joseph Haywood Campbell guilty of: (1) first-degree premeditated murder for the

benefit of a gang, in violation of Minn.Stat. §§ 609.185(a)(1) and 609.229, subd. 2 (2014); (2) first-degree premeditated murder, in violation of Minn.Stat. § 609.185(a)(1); and (3) second-degree intentional murder, in violation of Minn.Stat. § 609.19, subd. 1(1) (2014), for the October 14, 2012, death of Naressa Turner. The trial court convicted Campbell and sentenced him to life imprisonment without the possibility of release on count one— first-degree premeditated murder for the benefit of a gang. Campbell raises two issues on appeal: (1) whether the trial court committed reversible error when it admitted as substantive evidence out-of-court statements made to the police by one of the State's witnesses; and (2) whether the trial court committed reversible error when it admitted *Spreigl* evidence relating to a November 6, 2009, shots-fired incident. For the reasons discussed below, we affirm Campbell's conviction.

The events giving rise to Turner's death began with the February 2012 murder of Dominic Neeley, an Eastside Boys gang member. Although Turner was not a gang member, she was affiliated with both the Eastside Boys and the Selby Siders gangs, and witness testimony indicated that Turner's murder was in retaliation for her suspected role in setting up Neeley's murder. On the morning of October 14, 2012, Campbell, an associate of the Eastside Boys gang, visited L.J.'s home. According to L.J., while at her home, Campbell had a cell phone conversation using his speakerphone in which the caller mentioned to Campbell that Turner, who had moved out of town, had returned to the area.[1] To this comment, Campbell replied, "F--k her, F--k her, she's an 'OP.' "[2] L.J. also testi-

fied that Campbell had a handgun in his possession. After leaving L.J.'s home, Campbell received a ride from I.R. to a Super USA gas station on 7th Street East in St. Paul. I.R., a music producer, testified that Campbell was wearing a black North Face jacket and had agreed to participate in a music video that I.R. was producing later that day. The gas station surveillance camera recorded Campbell wearing a black North Face jacket and what witnesses described as a "Halloween mask."

That afternoon, Turner, along with her sister's boyfriend W.A., and his friend C.P., went riding in W.A.'s Cadillac Escalade to purchase marijuana. The three met with L.H. at the Super USA gas station on 7th Street East. L.H. was driving a Chevy Malibu with his girlfriend E.S. and his cousin R.B. as passengers. After leaving the gas station, W.A. followed L.H.'s car to a nearby alley, where they parked. I.R., Campbell, C.B., and D.M. then drove through the same alley in I.R.'s car. After passing W.A.'s Escalade, Campbell asked to be let out of the car. I.R. stopped the car, and Campbell and C.B. got out at a nearby corner. Moments later, a masked person approached the Escalade from the driver's side, walked behind it to the rear passenger-side door, and fired nine shots from a .22 caliber handgun into the vehicle at Turner, who sustained multiple gunshot wounds that resulted in her death. About 15 minutes later, I.R. spotted Campbell walking down the street. I.R. gave Campbell a ride and noted that Campbell was no longer wearing the black North Face jacket.

---

1. Following Neeley's death, L.J. posted on social media that Turner had "set up" Neeley. As a result, Turner began receiving threats. In response, Turner moved to Georgia in the summer of 2012.

2. According to the testimony at trial, "OP" refers to someone's status as being from the other side of the neighborhood.

The day after Turner was killed, the police interviewed L.H. During the interview, L.H. told the officers that he was one hundred percent certain that the person who shot Turner was wearing the same mask as a person L.H. had seen before the shooting at the Super USA gas station. At Campbell's trial, however, after having been shown a photo taken by the Super USA surveillance system the day of Turner's murder, L.H. testified that the "Halloween mask" in the surveillance photo did not match the mask worn by Turner's shooter. Later at trial, the State moved to admit two exhibits relating to L.H.'s police interview. Exhibit 106 contained a series of video clips from L.H.'s police interview and Exhibit 106–A contained transcripts of the statements from the video clips. Defense counsel made an unspecified objection to the State's motion. The precise exchange between the attorneys and the court was as follows:

Prosecutor: Your Honor, I move to admit Exhibit 106 and 106–A.

Defense counsel: Your Honor, I have an objection. Can we approach?

The Court: You can. Just a moment. (Whereupon, an off-the-record discussion was had at the bench and out of the hearing of the jury).

The Court: You may proceed.

Prosecutor: Your Honor, is Exhibit 106 [and] 106–A admitted?

The Court: I'm sorry. Exhibit 106 is admitted. Exhibit 106–A is admitted as a court exhibit only. Exhibit 106–A, as the other transcripts have been, ladies and gentlemen, it will be handed to you. It is to be used as an aid to your understanding the audio portion, and I ask you not to read ahead but use it only to assist your understanding of the audio.

The substance of defense counsel's objection was never placed on the record.

Separately, the State also moved to introduce testimony by St. Paul Police Officer Colby Bragg, who responded to a 2009 shots-fired incident in St. Paul. Campbell objected, asserting a specified objection that was overruled by the trial court.[3] Before Officer Bragg testified, the trial court gave the jurors a cautionary instruction regarding the use of Officer Bragg's testimony. Officer Bragg then testified that on November 6, 2009, Officer Bragg and his partner responded to a report of shots fired at Cypress Street and Minnehaha Avenue in St. Paul. When they arrived at the scene, Officer Bragg spoke to several witnesses but was unable to locate any suspects. Sometime later, Officer Bragg encountered a group of young men, including Campbell and Neeley, at the intersection of Beech Street and Duluth Street in St. Paul. Officer Bragg witnessed Campbell duck behind a car. Officer Bragg testified that a .32–caliber handgun was found near where Campbell ducked behind the car and that a left-handed black glove was found in Campbell's possession. He also testified that Campbell told him that he needed the gun for protection. Officer Bragg's testimony was relatively brief, comprising only seven pages of the approximately 1,200–page trial transcript. At the beginning of Bragg's testimony and in its final instructions to the jury, the trial court instructed the jurors on the use of Officer Bragg's testimony.

---

3. In admitting this evidence, the trial court stated that this incident was admissible because the location of the incident and the particular people with Campbell at the time had a significant nexus to the charged crime, and the incident was significant to show whether Campbell had knowledge about guns and how to protect against transferring DNA to a firearm.

During closing argument, the prosecutor made a single reference to L.H.'s police interview, telling the jury: "You heard [L.H.] and saw him in an interview the day afterwards." Immediately following that reference, the prosecutor turned her attention to one of the gas station surveillance photos. At no point during her closing argument did the prosecutor ever discuss the substance of L.H.'s police interview. Additionally, the prosecutor's closing argument did not include any discussion of Officer Bragg's testimony.

On appeal, Campbell contends that the trial court committed reversible error when it admitted L.H.'s police interview as substantive evidence and when it admitted Officer Bragg's testimony regarding the November 2009 shots-fired incident.

## I.

■ Campbell first argues that the trial court committed reversible error when it admitted L.H.'s interview statements as substantive evidence. We begin by noting that Campbell's counsel did not state the specific ground for the objection at issue on the record. Minnesota Rule of Evidence 103(a) provides: "Error may not be predicated upon a ruling which admits ... evidence unless ... a timely objection ... appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context...." [4] We are therefore faced with the threshold issue of whether the ground for defense counsel's objection is apparent from its context.

At trial, Campbell's counsel made an unspecified objection to the State's motion to admit Exhibit 106 (a series of video clips

from L.H.'s police interview) and Exhibit 106–A (the transcripts of the video clips). On appeal, Campbell argues, "[b]ecause [L.H.'s] trial testimony was inconsistent with his prior unsworn statement, there is only one reason to object to this statement: it is hearsay." We disagree.

■ We acknowledge that the basis for defense counsel's objection might have been hearsay. However, the context of the objection supports at least one other possible basis for the objection. More specifically, the objection might have been to the State's unqualified motion to admit Exhibit 106–A, which contained the transcripts of the excerpts from L.H.'s police interview. Ordinarily, the transcript of a recorded statement should not be admitted as an exhibit that would be available to the jurors during their deliberations. *See State v. Olkon,* 299 N.W.2d 89, 103–04 (Minn.1980) (explaining that the trial court properly followed the *McMillan* guidelines for use of transcripts of tape recordings at trial when the court limited the use of the transcripts to assisting the jurors when listening to the tapes). Here, immediately following the bench conference, the trial court said that Exhibit 106–A was "admitted as a court exhibit only" and its use was limited to aiding the jurors' "understanding [of] the audio portion." Moreover, when the jury later requested an opportunity to rehear the recordings of Campbell's and L.H.'s taped police interviews, defense counsel did not object, which suggests that defense counsel's objection to the State's motion to admit Exhibits 106 and 106–A focused on Exhibit 106–A (the transcript), rather than Exhibit 106 (the recorded interview). We therefore conclude that the

---

**4.** The comment to Minn. R. Evid. 103(a) further explains that a motion in limine to strike or prohibit the introduction of evidence also serves as a timely objection and "obviates the requirement of any further objection with re-

spect to such evidence." Minn. R. Evid. 103(a) comm. cmt.—1989. The record reveals that defendant's counsel did not make a motion in limine to strike or prohibit the introduction of the video clips of L.H.'s interview.

ground for defense counsel's objection to the State's motion to admit Exhibits 106 and 106–A is not apparent from its context.

Our conclusion that the basis for defense counsel's objection is not apparent from its context is not dispositive because Minn. R. Evid. 103(d) expressly permits us to take notice of "errors in fundamental law or of plain errors affecting substantial rights although they were not brought to the attention of the court." We reached a similar conclusion in *State v. Brown*, 792 N.W.2d 815, 820 (Minn.2011), and *State v. Rossberg*, 851 N.W.2d 609, 618 (Minn.2014). In *Brown* and *Rossberg* we reviewed alleged errors under the plain-error doctrine because we were unable to determine the specific ground for the objections in question from their context. In accordance with *Brown, Rossberg,* and Rule 103(d), we next consider whether the trial court committed plain error when it admitted the recording excerpts from L.H.'s police interview.

## II.

■ To obtain relief under the plain-error standard an appellant must show that: (1) there was an error; (2) the error was plain; and (3) the error affected substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). If each of those requirements is met, then we must determine whether the error seriously affected the "fairness, integrity or public reputation of judicial proceedings." *Id.* at 742. The failure to meet any one of the requirements dooms the appellant's claim.

■ Campbell argues that L.H.'s assertions during his police interview were prior-inconsistent statements that should have been admissible only for impeachment purposes and not as substantive evidence. According to Campbell, admitting L.H.'s interview statements as substantive

evidence affected Campbell's substantial rights by "substantially influenc[ing] the jury's decision." The State argues that if any error occurred it did not affect Campbell's substantial rights. Assuming, without deciding, that L.H.'s statements were erroneously admitted as substantive evidence, we conclude that any such error did not affect Campbell's substantial rights.

■ A defendant bears the "heavy burden" of showing that there is a reasonable likelihood that the alleged error substantially affected the verdict. *Rossberg*, 851 N.W.2d at 618; *see also State v. Little*, 851 N.W.2d 878, 884 (Minn.2014); *Griller*, 583 N.W.2d at 741. In determining whether a defendant has satisfied this burden, we have considered among other factors whether the evidence was cumulative to other admissible evidence and the extent to which the prosecutor relied on the evidence during closing argument. *State v. Davis*, 820 N.W.2d 525, 535 (Minn.2012). We have also considered the existence of overwhelming evidence of guilt. *Rossberg*, 851 N.W.2d at 618. Applying these factors to the facts in this case, we conclude Campbell has failed to show that the alleged error affected his substantial rights.

The recording excerpts from L.H.'s police interview were cumulative to other admissible evidence at trial that connected the mask worn by Campbell at the Super USA to the mask worn by the person who shot Turner. For instance, N.I., who was unconnected to the circumstances surrounding the shooting, testified that she saw the shooting from her window and that the shooter's mask was similar to the mask worn by Campbell in the Super USA surveillance photo. Also, E.S., L.H.'s girlfriend, provided a description of the shooter's mask that matched the mask worn by Campbell at the Super USA. Thus, there was evidence from two other witnesses connecting Campbell to the mask worn at

the Super USA gas station and the mask worn by the person who shot Turner. Moreover, the State's reliance on L.H.'s police interview was minimal. In closing argument, the prosecutor made a single passing reference to L.H.'s police interview. At no point during her closing argument did the prosecutor ever discuss the substance of L.H.'s police interview.

Finally, the evidence of Campbell's guilt was overwhelming. A number of witnesses testified that the shooter wore a black North Face jacket of the same type and color that Campbell wore at the Super USA gas station. There was also evidence that Campbell, while still wearing the jacket, asked to be, and was, dropped off after passing W.A.'s Escalade in the alley, and that when I.R. picked up Campbell 15 minutes later, Campbell was not wearing the jacket.

In sum, L.H.'s police interview was cumulative to other admissible evidence at trial, the State made minimal use of the interview in closing arguments, and the evidence of Campbell's guilt was overwhelming. We therefore conclude that Campbell has failed to satisfy his heavy burden of showing that there is a reasonable likelihood that the alleged error substantially affected the verdict.

### III.

 Next, we consider whether the trial court improperly admitted evidence of a previous crime, wrong, or act committed by Campbell. We review a trial court's decision to admit evidence of other crimes, wrongs, or acts for an abuse of discretion. *State v. Blom,* 682 N.W.2d 578, 611 (Minn. 2004) (citing *State v. Kennedy,* 585 N.W.2d 385, 389 (Minn.1998)). Such evidence, commonly known as *Spreigl* evidence, is inadmissible to prove a defendant's character, but may be admitted to show motive, intent, absence of mistake, identity, or

plan. Minn. R. Evid. 404(b); *State v. Spreigl,* 272 Minn. 488, 491 139 N.W.2d 167, 169 (1965). *Spreigl* evidence can be admitted only if:

> (1) notice is given that the state intends to use the evidence; (2) the state clearly indicates what the evidence is being offered to prove; (3) the evidence is clear and convincing that the defendant participated in the other offense; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*Kennedy,* 585 N.W.2d at 389. If it is unclear whether the *Spreigl* evidence is admissible, the benefit of the doubt should be given to the defendant and the evidence should be excluded. *Id.*

 To prevail on his *Spreigl* argument, Campbell must show that the trial court abused its discretion by admitting the evidence and that the erroneous admission was prejudicial. *Rossberg,* 851 N.W.2d at 615. The erroneous admission of *Spreigl* evidence is harmless unless it substantially influenced the verdict. *Id.* In determining whether the erroneous admission of *Spreigl* evidence substantially influenced the verdict, we consider several factors, including whether the trial court provided the jurors a cautionary instruction and whether the evidence was central to the State's case. *Id.* at 616. We have also considered the existence of overwhelming evidence of guilt. *Id.*

Here, the State contends that it introduced the *Spreigl* evidence to show Campbell's familiarity with the neighborhood where Turner was murdered, to establish Campbell's knowledge of firearms and how to prevent the transmission of DNA evidence to firearms, and to establish Campbell's connection to Neeley. Campbell asserts that the *Spreigl* evidence had no

legitimate purpose and was therefore irrelevant. Moreover, Campbell contends that the admission of this evidence was prejudicial because "Campbell's prior bad act significantly affected the verdict in a weak circumstantial case where no one identified Campbell as the shooter." As with the preceding issue, we need not decide whether the trial court erred when it admitted the *Spreigl* evidence because, on the facts presented, any error was harmless.

The trial court gave two limiting instructions regarding this *Spreigl* evidence—one before the introduction of the evidence and one during the final jury instructions. We presume that the jury followed these instructions. *See State v. James*, 520 N.W.2d 399, 405 (Minn.1994). Moreover, the prosecutor made no reference to Officer Bragg's testimony during her closing argument. Finally, there was overwhelming evidence of Campbell's guilt. As previously discussed, a number of witnesses identified Campbell as wearing the mask and a black North Face jacket at the Super USA gas station, and other witnesses connected the mask and jacket to the person who shot Turner. Moreover, I.R. testified that Campbell asked to be dropped off upon seeing W.A.'s Escalade in the alley, and when I.R. picked up Campbell 15 minutes later, Campbell was not wearing his jacket. Further, L.J. testified that Campbell had a gun in his possession on the day of the murder and made disparaging comments about Turner. Given the record before us, we conclude that the allegedly erroneous admission of Officer Bragg's testimony regarding the 2009 shots-fired incident did not substantially influence the verdict.

In sum, the trial court's allegedly erroneous evidentiary rulings did not substantially affect or influence the jury's verdict. We therefore affirm Campbell's conviction.

Affirmed.