*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-0508**

State of Minnesota,
Respondent,

vs.

Brian J. Machacek,
Appellant.

**Filed June 29, 2015
Affirmed
Schellhas, Judge
Concurring specially, Minge, Judge**

Steele County District Court
File No. 74-CR-10-405

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Daniel McIntosh, Steele County Attorney, Owatonna, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer Workman Jesness, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Schellhas, Presiding Judge; Larkin, Judge; and Minge, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

Appellant challenges his convictions of first-degree assault and the denial of postconviction relief. We affirm.

**FACTS**

In the early morning hours of February 19, 2010, police officers learned that appellant Brian J. Machacek was reportedly suicidal and had left a Medford-area residence in his white sport utility vehicle. Steele County Deputy Sheriff Chad Forystek and Dodge County Patrol Deputy David Crable were among the officers who drove around the Medford area to look for Machacek's SUV.

Officers located and pursued the SUV but they were unable to stop it and periodically lost contact with it, as it made frequent and sudden changes in direction. During the pursuit, Machacek appeared to be in control of the SUV, which was traveling at speeds of up to 90 miles per hour on gravel roads without weaving, swerving, or "wander[ing]" out of its lane of travel. The roads in the Medford area were dry, and winds were calm.

Near the end of the pursuit, Machacek drove the SUV past Deputy Forystek's squad car and then turned the SUV around—although no roadblock or other physical obstruction had blocked its path—and approached the squad car head-on. Deputy Forystek thought that the SUV was going to hit his squad car head-on, so he drove into a snowy ditch to avoid a collision. Shortly thereafter, Deputy Crable, who had exited his squad car to deploy stop sticks, saw the SUV approaching his location at a high rate of

speed. Machacek made a sharp right turn, placing the SUV directly in Deputy Crable's path, and accelerated toward Deputy Crable. As Deputy Crable tried to avoid being hit by the SUV, he felt a very strong blow to his lower back that was intense enough to knock him down and push him forward. He fell to the ground and heard a "large impact." The SUV crashed into Deputy Crable's squad car and flipped over.

Before Machacek's extraction from the SUV, he yelled and cursed at officers and denied that he had "come at" Deputy Forystek. During a subsequent police interview, Machacek denied having any memory of the pursuit or the crash. No mechanical or other defect was found in the SUV that might have contributed to the crash. Deputy Crable suffered soft tissue damage to his lower back but has no ongoing complications from his injuries.

Respondent State of Minnesota charged Machacek with two counts of first-degree assault (deadly force against peace officer), under Minn. Stat. § 609.221, subd. 2(a) (2008). Machacek noticed alternative defenses of not guilty and not guilty by reason of mental illness, triggering a bifurcated, two-phase jury trial at which the district court ruled inadmissible for impeachment purposes Machacek's 1997 conviction of third-degree assault. Machacek presented a phase-one defense that he had lacked intent to commit first-degree assault, but the jury found that the state had proved the elements of both counts of first-degree assault beyond a reasonable doubt. Machacek's phase-two defense theory was that his bipolar disorder had caused a psychotic break that relieved him of criminal liability. The jury rejected Machacek's mental-illness defense and found

him guilty of both counts of first-degree assault. The district court sentenced Machacek to concurrent sentences of 120 months' imprisonment for each count.

On Machacek's motion, this court stayed Machacek's subsequent direct appeal, and Machacek petitioned for postconviction relief on grounds of ineffective assistance of counsel. The postconviction court conducted an evidentiary hearing and denied relief. This court dissolved the stay, and this combined appeal follows.

## D E C I S I O N

### *Ineffective assistance of counsel*

On review of the denial of postconviction relief on a claim of ineffective assistance of counsel, appellate courts review the postconviction court's factual findings for clear error and its legal conclusions de novo. *State v. Nicks*, 831 N.W.2d 493, 503 (Minn. 2013). "Ultimately, [appellate courts] review a denial of a petition for postconviction relief . . . for an abuse of discretion. A postconviction court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Id.* (quotation and citation omitted).

"To prevail on a claim that his counsel was ineffective," a defendant must prove that counsel's "performance fell below an objective standard of reasonableness," which is "representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Vang*, 847 N.W.2d 248, 266–67 (Minn. 2014) (quotations omitted). The defendant also must prove prejudice—i.e., "a reasonable probability . . . that, but for the attorney's

4

unprofessional error, the outcome would have been different." *Id.* "[Appellate courts] need not analyze both prongs if either one is determinative." *Id.* at 266.

Machacek argues that defense counsel was ineffective for (1) failing to use a peremptory strike against a biased juror, (2) failing to adequately investigate and prepare before trial, and (3) asking Machacek a damaging question on direct examination. Each of these purported deficiencies arguably is insulated from appellate scrutiny as a matter of trial strategy. *See State v. Hokanson*, 821 N.W.2d 340, 358 (Minn. 2012) (stating that "[appellate] courts do[] not review matters of trial strategy or the particular tactics used by counsel"); *State v. Nissalke*, 801 N.W.2d 82, 111 (Minn. 2011) (stating that "the depth of . . . counsel's investigation" and counsel's "decisions to present certain evidence and call certain witnesses at trial are tactical decisions properly left to the discretion of trial counsel" (quotation omitted)); *Jama v. State*, 756 N.W.2d 107, 113 (Minn. App. 2008) (stating that "Minnesota courts have recognized that attorneys must make tactical decisions during jury selection, and a claim of ineffective assistance of counsel cannot be established by merely complaining about counsel's failure to challenge certain jurors" (quotations omitted)). *But see Nicks*, 831 N.W.2d at 507 (noting that "almost any failing by a trial counsel contains components that could be articulated as a decision or a choice" and suggesting that trial strategy should be treated "as a factor that [appellate courts] use to assess ineffective assistance claims," not as "an impregnable barrier to [such] claims"). In this case, none of the purported deficiencies satisfies the two-prong test for ineffective assistance of counsel.

***Decision to not strike juror peremptorily***

During voir dire, juror J.J. disclosed prior knowledge of Machacek, describing a casual friendship between her estranged husband and Machacek that had ended about 20 years earlier due to a disagreement "back in the day and over ice fishing." J.J. agreed that it would be "probably just a little awkward" to serve on the jury. She also had the following exchange with defense counsel:

> J.J.: . . . I just think that it might be—I think there is more history [surrounding the disagreement] than I am aware of, and I don't know if he would feel comfortable with me being on the jury.
> DEFENSE COUNSEL: Let me ask you that way: If you were in . . . Machacek's place, would you want you to be sitting in the jury?
> J.J.: Probably—probably not.

Machacek argues that "no objectively reasonable rationale or strategy existed for leaving [J.J.] on the jury panel" in light of her "obvious[] bias[]" against Machacek. But "a juror's answer must be viewed in context to determine whether it demonstrated actual bias." *State v. Munt*, 831 N.W.2d 569, 578 (Minn. 2013). J.J. never expressed any doubt that she would be a fair and impartial juror, instead unequivocally stating that she "would be fair," that she had "nothing against [Machacek]," and that she knew that she "could be fair." Viewed in context, J.J.'s acknowledgment that her jury service might raise mildly negative *feelings* in her or Machacek was not an expression of actual bias. *Cf. State v. Fraga*, ___ N.W.2d ___, ___, 2015 WL 1810487, at *9 (Minn. Apr. 22, 2015) (concluding that juror expressed actual bias where he stated that he knew about case, that "it would be hard" to be fair and impartial, that he had discussed "details" of case with

6

his family and friends, and that case brought word "sickening" to mind) (quotation marks omitted).

Moreover, J.J. disclosed that a close family member had a history of depression, anxiety, and suicidal ideation and explained that her experiences with this family member would help her to understand evidence regarding mental illness. Given Machacek's assertion of a mental-illness defense, an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances may have weighed J.J.'s intimate connection with mental illness more heavily than her glancing acquaintance with Machacek. *See Dunn v. State*, 499 N.W.2d 37, 38 (Minn. 1993) (rejecting ineffective-assistance claim based on counsel's failure to strike juror whose wife's uncle was state's witness, reasoning that "[c]ounsel questioned [juror] about his relationship to [witness] and, satisfied that no real risk of bias existed, reasonably decided not to exercise a peremptory challenge against him").

We acknowledge that defense counsel testified at the postconviction hearing that his decision not to strike J.J. was "a pretty grievous error." But because counsel's performance is measured against an *objective* standard of reasonableness, *see Vang*, 847 N.W.2d at 266, we are not persuaded by counsel's *subjective* opinion that his failure to strike J.J. was unreasonable, *cf. State v. Prtine*, 799 N.W.2d 594, 599–600 (Minn. 2011) (rejecting argument that "[counsel's concession] was not an understandable trial strategy," regardless of whether "the concession was based on trial counsel's fundamental misunderstanding of the law," because "the issue of whether [the concession] was an understandable trial strategy . . . is based on objective notions of reasonableness").

7

Counsel's decision not to use a peremptory strike against J.J. did not fall below the objective standard of reasonableness and thus was not ineffective assistance of counsel.

### *Pretrial investigation and preparation*

Machacek also argues that defense counsel failed to undertake adequate pretrial preparation and investigation, pointing to, among other things, counsel's "overwhelming caseload," personal distractions, and professional procrastination; failure to investigate potential expert witnesses, including an accident reconstructionist, an expert on blackouts or memory lapses, an expert in retrograde extrapolation, and a bipolar-disorder expert; and failure to consult with a more experienced attorney. An attorney's failure to thoroughly investigate or prepare to admit testimonial or other evidence may "fall[] below an objective standard of professional conduct that defendants are entitled to under the United States Constitution." *See Nicks*, 831 N.W.2d at 508 (reversing summary denial of postconviction petition where defendant alleged that trial counsel failed to obtain cellphone records upon which defense theory hinged). But "limited trial preparation time does not alone constitute grounds for establishing ineffective assistance of counsel. Instead, the proper focus . . . should be on the adversarial process rather than the defendant's assessment of his lawyer's preparation." *State v. Caldwell*, 803 N.W.2d 373, 387 (Minn. 2011) (quotation omitted).

Prior to trial in this case, defense counsel spoke with Machacek, investigated and tried to locate potential witnesses, obtained Machacek's medical records, spoke with the mental-health professional who had diagnosed Machacek with bipolar disorder, researched bipolar disorder and psychotic breaks, requested and obtained an independent

Rule 20 evaluation, noticed and developed a mental-illness defense, moved to exclude prior-conviction evidence, made at least nine other pretrial motions, utilized an investigator, subpoenaed witnesses, prepared a 64-question jury questionnaire, and asked questions during voir dire. Counsel's basic readiness for trial was exhibited when he cross-examined every state's witness, called seven defense witnesses, made opening and closing arguments, and raised numerous objections at trial. In light of the "strong presumption that counsel's performance was reasonable," *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013), this record does not show that the adversarial process was undermined by any lack of pretrial investigation and preparation, *see State v. Rhodes*, 657 N.W.2d 823, 843–45 (Minn. 2003) (reasoning that "[l]egal representation is an art, not a science," and concluding that "counsel's conduct falls squarely within the wide range of reasonable professional assistance," notwithstanding counsel's failure to utilize potentially advantageous methods of investigation and preparation).[1]

Even if an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances would have engaged in more or different investigation and preparation before Machacek's trial, we agree with the postconviction court that Machacek failed to establish a reasonable probability that the outcome of his trial would have been different had defense counsel done so. Machacek makes vague and conclusory assertions that, among other things, unnamed expert witnesses "would have been helpful" and that his "chances of success at trial were

---

[1] We reject as immaterial defense counsel's subjective opinion that his investigation and preparation did not meet the objective standard of reasonableness. *See Vang*, 847 N.W.2d at 266.

9

seriously impacted" by counsel's lack of preparation. But, as aptly noted by the postconviction court, Machacek offered neither testimony nor affidavits setting out other possible witnesses' testimony. The record likewise contains no hint of what counsel might have learned in consultation with another attorney or from more time spent with Machacek's file. Because Machacek did not prove that he was prejudiced by counsel's purportedly deficient investigation or preparation, any such deficiency was not ineffective assistance.

### *Question on direct*

Machacek argues that the following portion of defense counsel's phase-one direct examination was deficient performance:

> DEFENSE COUNSEL: As far as you knew, [Machacek], when you were having these suicidal thoughts, had you ever contemplated taking anybody with you?
> MACHACEK: None. That's the last thing I had wanted to do is hurt anybody else.

According to Machacek, "[a] competent trial attorney would have avoided asking [him] a question about intent to cause harm because it could 'open the door' to" evidence of Machacek's 1997 conviction of third-degree assault, which the district court had ruled was inadmissible for impeachment purposes. But, as discussed below, we conclude that the district court erred by admitting evidence of Machacek's 1997 assault conviction as a result of Machacek's answer to the above question. We reject Machacek's argument that an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances should have expected the question to lead to the admission of prior-conviction evidence. We agree with the postconviction

10

court that, "[w]hile counsel's question could certainly have been more carefully phrased . . . , competent, effective representation is not the same as perfection." We conclude that counsel's question did not fall below the objective standard of reasonableness and that the question therefore was not ineffective assistance of counsel.

### Assault jury instructions

Appellate courts review unobjected-to jury instructions for plain error. *Vang*, 847 N.W.2d at 261; *see State v. Kelley*, 855 N.W.2d 269, 273 (Minn. 2014) (reviewing jury instruction for plain error where defendant did not object to instruction on specific basis asserted on appeal); *see also* Minn. R. Crim. P. 31.02 (providing that "[p]lain error affecting a substantial right can be considered . . . even if it was not brought to the trial court's attention"). "Under the plain-error doctrine, the appellant must show that there was (1) an error; (2) that is plain; and (3) the error must affect substantial rights." *Kelley*, 855 N.W.2d at 273–74. "An error is plain if it is clear or obvious; this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct." *State v. Mosley*, 853 N.W.2d 789, 801 (Minn. 2014), *cert. denied*, 135 S. Ct. 1185 (2015). Conversely, an error that violates or contradicts law that is unsettled at the time of appellate review is not plain. *Kelley*, 855 N.W.2d at 277, 280 n.9.

In this case, the district court gave the following instructions on the first count of first-degree assault (deadly force against peace officer):

> The statutes of Minnesota provide that whoever assaults a peace officer by using or attempting to use deadly force against the peace officer while the officer is engaged in the performance of a duty imposed by law, policy, or rule is guilty of a crime.

11

The elements of assault on a peace officer are: First, the defendant assaulted Chad Forystek. An assault is the intentional infliction of bodily harm upon another, an intentional attempt to inflict bodily harm upon another, and/or an act done with intent to cause fear of immediate bodily harm or death in another. Second, Chad Forystek was a peace officer at the time of the assault and was engaged in the performance of a duty imposed by law, policy, or rule. Third, the defendant used or attempted to use deadly force against Chad Forystek.

Deadly force means force the actor uses with the purpose of causing or the actor should reasonably know creates a substantial risk of causing death or great bodily harm. Great bodily harm means bodily harm that creates a high probability of death, causes serious permanent disfigurement, or causes a permanent or protracted loss or impairment of the function of any part of the body, or other serious bodily harm. Fourth, the defendant's act took place on or about February 19th, 2010, in Steele County.

The district court gave functionally identical instructions on the second count of first-degree assault (deadly force against peace officer), substituting "David Crable" for "Chad Forystek." Machacek argues that these instructions are plainly erroneous because they "failed to explain that assault-harm, assault-fear, and attempted assault are different crimes with different mens rea requirements" and "gave the jury the option of basing a guilty verdict on differing forms of assault, which violated [Machacek]'s right to a unanimous verdict."[2]

---

[2] Machacek also argues that the instructions are plainly erroneous because "[a]ttempted assault-harm is not a valid offense." We summarily reject this argument in light of the statute providing that an "attempt to inflict bodily harm upon another" is an assault. *See* Minn. Stat. § 609.02, subd. 10(2) (2008).

12

"Jury verdicts in all criminal cases must be unanimous." *State v. Pendleton*, 725 N.W.2d 717, 730 (Minn. 2007) (citing Minn. R. Crim. P. 26.01, subd. 1(5)). "To achieve that end, a jury must unanimously find that the government has proved each element of the offense. But the jury does not have to unanimously agree on the facts underlying an element of a crime in all cases." *Id.* at 730–31 (quotation and citation omitted). In other words, a jury need not unanimously agree on one of several "alternatives to satisfying a single element" of a crime as long as the jury unanimously agrees that the element is satisfied. *See id.* at 730–31 & n.8 (rejecting defendant's argument that "a jury must unanimously find [that a person charged with felony murder while committing kidnapping] had one of the four listed purposes" for the kidnapping, reasoning that "the enumerated purposes a[re] alternatives to satisfying a single element of kidnapping"). The central question here is whether assault-harm and assault-fear are two distinct offenses—each with a separate intent element—or whether assault-harm and assault-fear are but two ways of satisfying a single element—i.e., an assaultive act—common to all assault crimes.

We addressed a related question in *State v. Dalbec*, 789 N.W.2d 508 (Minn. App. 2010), *review denied* (Minn. Dec. 22, 2010). In that case, the defendant was tried on one count of gross misdemeanor domestic assault arising from his multiple acts of violence against a single victim in a single location over the course of about 24 hours. *Dalbec*, 789 N.W.2d at 509–10. The district court instructed the jury that it could find the defendant guilty if it unanimously agreed that "[he] committed an act with the intent of causing fear of immediate bodily harm or intended or attempted to inflict bodily harm on the victim

13

. . . rather than instructing the jury that it must agree on which of several acts constituted this element." *Id.* at 511. We rejected the defendant's argument that these jury instructions were plainly erroneous, stating that "the act of assault is the element of the crime of domestic assault, and an assault can be committed in any of three ways"—"by intentionally causing fear of immediate bodily harm or death or by intentionally inflicting or attempting to inflict bodily harm." *Id.* at 512–13. We reasoned that "[t]he jury could agree . . . that [the defendant] intended to assault [the victim], but need not agree on whether the assault was accomplished by causing fear or inflicting or attempting to inflict bodily harm," and "[w]e conclude[d] that the district court did not plainly err by failing to instruct the jury that it must unanimously determine which action, among several proved, supported the element of assault in a charge of domestic assault." *Id.* at 513.

But subsequently in *State v. Fleck*, the supreme court held that the intentional infliction of bodily harm upon another (assault-harm) is a general-intent crime, while an act done with intent to cause fear in another of immediate bodily harm or death (assault-fear) is a specific-intent crime. 810 N.W.2d 303, 312 (Minn. 2012). We recognize that *Fleck* dealt with a defendant's entitlement to a voluntary-intoxication instruction; it did not address assault instructions. *See id.* at 305–07. And the United States Supreme Court has concluded that a state constitutionally may "define different . . . states of mind . . . as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which . . . state actually occurred." *Schad v. Arizona*, 501 U.S. 624, 632, 111 S. Ct. 2491, 2497 (1991). Yet *Fleck* contains language that may be read to suggest that assault-harm and assault-fear are distinct

14

offenses. *See Fleck*, 810 N.W.2d at 306 (referring to, e.g., "the *offenses* of assault-harm and assault-fear" and to "the assault-harm offense *and* the assault-fear offense" (emphasis added)). We have cited *Dalbec* with approval in post-*Fleck* unpublished opinions rejecting jury-unanimity arguments in assault cases; two of the cases include a dissenting opinion questioning *Dalbec*'s continued viability in light of *Fleck*, and the supreme court has granted and stayed further review of these two cases pending its decision in yet another case involving jury unanimity, *State v. Wenthe*, 845 N.W.2d 222 (Minn. App. 2014), *review granted* (Minn. June 25, 2014). *See State v. Moallin*, No. A14-0329, 2014 WL 7237037, at *2, *4–6 (Minn. App. Dec. 22, 2014), *review granted and stayed* (Minn. Feb. 25, 2015); *State v. Evans*, No. A13-2256, 2014 WL 7011130, at *3, *6 (Minn. App. Dec. 15, 2014), *review granted and stayed* (Minn. Feb. 25, 2015). Against this backdrop, we conclude that any error in the district court's assault instructions is not plain.

### *Admission of prior-conviction evidence*

Appellate courts review a district court's admission of evidence regarding a defendant's prior conviction for abuse of discretion. *State v. Williams*, 771 N.W.2d 514, 518 (Minn. 2009). "Under an abuse-of-discretion standard, [appellate courts] may reverse the district court when the district court's ruling is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Bustos*, 861 N.W.2d 655, 666, (Minn. 2015) (quotation omitted).

Evidence of a defendant's prior conviction "is not admissible to prove the character of [the defendant] in order to show action in conformity therewith," *see* Minn. R. Evid. 404(b), but such evidence may be admissible under other circumstances. For

15

example, evidence of a defendant's prior conviction may be admissible for non-character purposes such as proving the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See id.*; *see also State v. Spreigl*, 272 Minn. 488, 491–94, 139 N.W.2d 167, 169–172 (1965). In addition, evidence of a defendant's prior conviction may be admissible for the purpose of impeaching the credibility of his testimony. *See* Minn. R. Evid. 609(a); *see also State v. Jones*, 271 N.W.2d 534, 537–38 (1978).

Here, the state made no attempt to introduce evidence of Machacek's 1997 conviction of third-degree assault as *Spreigl* evidence admissible under rule 404(b). And in response to Machacek's pretrial motion, the district court applied the *Jones* factors and ruled that evidence of the 1997 assault conviction was not admissible to impeach Machacek's credibility under rule 609(a). But defense counsel asked Machacek on direct examination: "[W]hen you were having these suicidal thoughts, had you ever contemplated taking anybody with you?" Machacek answered: "None. That's the last thing I had wanted to do is hurt anybody else." The prosecutor argued that Machacek's answer was "character evidence" that Machacek had "present[ed] through himself," opening the door to cross-examination about his prior conviction to "rebut[] his character evidence." The district court agreed, reasoning that Machacek's answer was a general statement of character that implicated "the essential element of the defense" that he "did not intend to hurt anybody." The court concluded that reference to the 1997 assault conviction was admissible in cross-examination to rebut Machacek's character evidence

under rules 404(a)(1) and 405. The prosecutor accordingly elicited testimony from Machacek regarding his 1997 assault conviction.

Had Machacek testified that he is a peaceful or nonviolent man, the prosecutor properly could have rebutted that testimony using specific instances of conduct— including the 1997 assault conviction—to show the contrary character trait of a tendency toward aggression or violence. *See State v. Jones*, 755 N.W.2d 341, 353 (Minn. App. 2008) (concluding that "it was proper for the state to rebut . . . evidence [of defendant's nonthreatening character] with . . . testimony concerning" defendant's "prior criminal acts, including an order for protection filed against him and a prior assault conviction"), *aff'd*, 772 N.W.2d 496 (Minn. 2009). But Machacek did not testify about his character; instead, he testified about the particulars of his suicidal ideation "[a] couple days" before the crash. Because the district court based its evidentiary ruling on character testimony that does not exist in the record, the court abused its discretion by allowing the admission of the prior conviction.

But the erroneous admission of Machacek's prior conviction was harmless unless it substantially influenced the verdict. *See State v. Campbell*, 861 N.W.2d 95, 102 (Minn. 2015); *see also* Minn. R. Crim. P. 31.01 (providing that "[a]ny error that does not affect substantial rights must be disregarded"). Relevant to the harmless-error inquiry are factors such as "whether the trial court provided the jurors a cautionary instruction and whether the evidence was central to the State's case." *Campbell*, 861 N.W.2d at 102. "[The supreme court] ha[s] also considered the existence of overwhelming evidence of guilt." *Id.*

17

In this case, the district court gave the following cautionary instruction prior to the jury's phase-one deliberations:

> [Y]ou have heard evidence of the defendant's prior conviction of third-degree assault from 1997. You may only consider this evidence in your consideration of the weight to be given opinion evidence regarding character for peacefulness. The defendant is not being tried for and may not be convicted of any offense other than the charged offenses. You are not to convict the defendant on the basis of the 1997 occurrence.

The jury is presumed to have followed this instruction. *See id.* at 103. The prosecutor did not refer to the 1997 assault conviction in his closing argument. Moreover, the evidence presented to the jury overwhelmingly showed that Machacek committed two counts of first-degree assault (deadly force against peace officer), including law-enforcement testimony that Machacek, while driving at speeds of up to 90 miles per hour, appeared to be in control of the SUV before the crash; that neither the condition of the roads nor the condition of the SUV contributed to the crash; that the SUV "attempt[ed] to hit" Deputy Forystek's squad car head-on; that the SUV "placed itself directly in [Deputy Crable's] path" and accelerated towards him; and that Deputy Crable received a strong blow to his lower back while trying to run away from the SUV. The jury also viewed photographs and squad-car video recordings that bolstered the officers' testimony. We conclude that evidence regarding Machacek's 1997 assault conviction did not substantially influence the verdict. The erroneous admission of such evidence therefore was harmless.

**Affirmed.**

18

**MINGE**, Judge (concurring specially)

I join in affirming. I add this concurrence to state that defense counsel's volunteering that he provided ineffective representation and identifying serious reasons why his representation was deficient should constitute a prima facie showing of ineffectiveness. I note with concern that the public defender's office was initially assigned to represent appellant and an attorney was assigned to the case. After almost six months the public defender's office sought to withdraw due to insufficient resources to provide defense services for appellant, that the district court rejected this request and directed the office to retain outside counsel to reduce its caseload to the extent necessary to meet its constitutional responsibility. A new attorney then represented appellant for over seven months, when a third attorney took over appellant's defense. Nine months later a fourth attorney was appointed. This attorney handled the trial but later stated that he should not have allowed a juror to serve, that he should have obtained a continuance to adequately prepare for trial, that his attention was repeatedly diverted by personal matters, that he had an overwhelming caseload, that he scrambled to subpoena witnesses, that he did not secure potential expert witnesses on a variety of subjects including appellant's bipolar condition, and that although he had never tried a case similar to appellant's, he did not consult with a more experienced attorney.

However, I concur because respondent state countered the general reasons, arguing that, in the context of this case, defense counsel's statement was not a persuasive showing of ineffective assistance that resulted in appellant's conviction. Appellant never produced any expert opinion or other evidence at the postconviction-evidentiary hearing

further supporting his claim of ineffective representation on these matters. For example, there was no showing or any professional opinion regarding a best practice in dealing with a juror who may not have been favorable on the issue of assault but would possibly be a highly desirable juror on the mental illness defense. Similarly, there was no showing how an expert opinion on appellant's specific bipolar condition would establish the defense of not guilty due to mental illness. Finally, although the Minnesota judicial system has expressed great concern over the inadequate budget for the public defender system and some problems with providing adequate representation undoubtedly occurred, there is no specificity of what happened in this proceeding that establishes that it resulted in appellant receiving ineffective representation affecting the result.